RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0080p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JOHN K. HARDEN,

*Plaintiff-Appellant*,

*v.*

No. 20-5056

KEITH HILLMAN, Individually and in his Official Capacity as a Police Officer of Heritage Creek, Kentucky; CITY OF HERITAGE CREEK, KENTUCKY,

*Defendants-Appellees*.

───────────────

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:15-cv-00594—Joseph H. McKinley, Jr., District Judge.

Argued: January 14, 2021

Decided and Filed: April 6, 2021

Before: SUHRHEINRICH, CLAY, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Aubrey Williams, Louisville, Kentucky, for Appellant. Mark A. Osbourn, BUSH & OSBOURN, PLLC, Louisville, Kentucky, for Appellees. **ON BRIEF:** Aubrey Williams, Louisville, Kentucky, for Appellant. Mark A. Osbourn, BUSH & OSBOURN, PLLC, Louisville, Kentucky, for Appellees.

CLAY, J., delivered the opinion of the court in which DONALD, J., joined, and SUHRHEINRICH, J., joined in all but Part III.C. SUHRHEINRICH, J. (pp. 24–28), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

CLAY, Circuit Judge.  In this action, Plaintiff John Harden, an African American man, asserted a number of claims under 42 U.S.C. § 1983 against Officer Keith Hillman, the City of Heritage Creek, and Thorntons, Inc., alleging violations of his constitutional rights, as well as claims under Kentucky law.  Harden's claims arose out of his arrest and prosecution following an incident at a Thorntons convenience store in Louisville, Kentucky.  Besides Harden's excessive force claim against Hillman, all of his claims were dismissed prior to trial.  Following a trial, the jury returned a verdict in favor of Hillman on the excessive force claim.

Harden now appeals the district court's grant of summary judgment on his claim that his Fourth Amendment right to be free from arrest without probable cause was violated; the district court's denial of his first Motion for New Trial, which was based on both the district court's refusal to order the U.S. Marshals Service to serve his witnesses with subpoenas and allegedly improper comments made by Hillman's counsel at trial; and the district court's denial of his second Motion for New Trial, which was based on an affidavit from a juror detailing various issues she experienced and discovered during the jury's deliberation.

For the reasons set forth in this opinion, we **AFFIRM** the district court's grant of summary judgment to Hillman on Harden's claim that he was arrested without probable cause, **AFFIRM** the district court's order denying Harden's first Motion for New Trial, **VACATE** the district court's order denying Harden's second Motion for New Trial, and **REMAND** the case to the district court for further proceedings consistent with this opinion.

**BACKGROUND**

**A.  Factual Background**

On August 1, 2014, after finishing work, Harden went home, drank a couple of beers, and fell asleep.  He awoke at 1:20 a.m. and decided to purchase more beer.  Knowing that beer was only sold in Kentucky until 2:00 a.m., Harden rushed to a nearby Thorntons store.  When he

entered Thorntons, he noticed a uniformed police officer, Hillman, providing security for the store outside of his regular hours as an officer for the City of Heritage Creek.

After choosing a beer, Harden attempted to pay. However, the store clerk told Harden, "I'm not serving you" because "I think you've had too much to drink already anyway." (Harden Dep., R. 95-2 at PageID# 865.) The store clerk also told Harden that she smelled alcohol on his breath. Harden tried explaining that he had only had a couple of beers many hours earlier. The store clerk did not change her mind. Harden then exclaimed, "I don't believe this." (*Id.* at PageID# 866.) At that point Hillman shouted, "didn't she say she wasn't selling you any beer." (*Id.*) When Harden confirmed the store clerk's statement, Hillman said, "[w]ell, get out of the store right now and don't come back." (*Id.*)

Harden then left Thorntons and decided to go to another store to purchase beer. But when he checked the time, he realized that he would not be able to make it anywhere else before 2:00 a.m. He decided to give up on buying beer and to, instead, purchase a bag of chips from Thorntons. While he was in the store, Hillman said, "I thought I told you not to come back in here." (*Id.* at PageID# 867.) Hillman then ran over to Harden and pinned him against the counter. While pinning Harden, Hillman told him, "[y]ou get out of the store right now and don't come back, or I'm going to take you to jail." (*Id.*) Harden replied, "[w]ell, take me to jail." (*Id.*) Hillman then allegedly picked Harden up off the ground, slammed him down onto the floor, and handcuffed him.

Hillman subsequently called for a transport to the police station. However, after Harden told him that "I need to go to the doctor. I'm hurt pretty bad. You've messed up my back," Hillman called for emergency medical services, which transported Harden to the University of Louisville Hospital. (Harden Dep., R. 95-3 at PageID# 946.) At the hospital, Hillman issued Harden a citation for disorderly conduct, resisting arrest, and public intoxication. Harden was released that same night. The charges against Harden were eventually dismissed after Hillman failed to appear for court.

**B. Procedural Background**

On July 8, 2015, Harden filed suit in the district court against Hillman, in his individual and official capacities; Thorntons, Inc.; and Hillman's employer, the City of Heritage Creek. In Count I, Harden alleged that Hillman deprived him of various constitutional rights. In Count II, Harden asserted a claim against Hillman for assault. In Count III, Harden alleged claims of false arrest and false imprisonment against Hillman. And in Count IV, he alleged that Hillman maliciously prosecuted him. Harden also asserted that Heritage Creek and Thorntons were liable for Hillman's actions on all four counts.

On summary judgment, the claims against Thorntons and Heritage Creek were all dismissed. Summary judgment was also granted to Hillman on Counts III and IV. As for Count I against Hillman, the district court granted summary judgment on the official capacity claim and construed the individual capacity claim as raising both an excessive force claim and an arrest without probable cause claim. The district court denied summary judgment on the excessive force claim but granted it on the arrest without probable cause claim. The assault claim in Count II was also dismissed pretrial. Thus, only Harden's excessive force claim against Hillman in Count I proceeded to trial.

On June 28, 2019, shortly before trial was set to begin, Harden's counsel allegedly "delivered to the United States Marshal[] subpoenas to be served on various witnesses whom he intended to call to testify on behalf of Plaintiff." (Mot. for a New Trial, R. 181 at PageID# 2297.) On July 10, 2019, five days before trial, Harden's counsel's assistant was told by the Marshals Service's office "that they did not serve civil subpoenas unless ordered to do so by the judge." (*Id.*) Harden then called the district court's case manager and requested that the district court order the Marshals Service to serve the subpoenas, but the district court refused. Through a process server, Harden's witnesses were then served with subpoenas but several failed to appear for trial.

After a three day trial, on July 17, 2019, the jury returned a verdict in favor of Hillman on the excessive force claim. On August 15, 2019, Harden filed a Motion for New Trial based on both the district court's refusal to order the Marshals Service to serve his subpoenas and on

Hillman's counsel allegedly making improper arguments to the jury. The district court denied the motion and further explained:

> [T]he service of subpoenas is, in all due respect, not a matter of the Court's refusal to exercise its "plenary authority" to order the Marshal to serve the subpoenas, but instead, a simple matter of the failure of Plaintiff's counsel to take appropriate steps to ensure his trial subpoenas were properly served. There was no motion made for a continuance nor any showing why the Marshals Service should have been ordered to serve the subpoenas.

(Order, R. 199 at PageID# 2488.) The district court also held that there was "no misconduct on the part of defense counsel." (*Id.*)

On September 24, 2019, Harden's counsel filed a Motion for Leave of Court to Contact Juror Post Trial explaining that he was contacted by the stepfather of one of the jurors who told him that, during *voir dire*, a juror had "concealed that his father was either a current or retired commander/sergeant of a local police department" and that the same juror "falsely explain[ed] the law to the jurors." (Mot. for Leave of Court to Contact Juror Post Trial, R. 193 at PageID## 2458–59.) Over Hillman's objection, the district court granted the motion.

Harden's counsel subsequently filed a second Motion for New Trial along with an affidavit from Juror T.H. In her affidavit, T.H., an African American woman, stated that her "service on the jury was a very painful, humiliating and embarrassing experience, so much so that it has caused me not to ever again want to serve on another jury. I feel this way because of the blatant racial stereotyping, bias, and prejudice shown by my fellow jurors toward Mr. Harden and his legal team."[1] (Aff. of T.H. Juror, No. 010145, R. 201-1 at PageID# 2494.) She explained that her "fellow jurors, all of whom were white, spoke freely in [her] presence because they thought [she] was Latin[a] because of [her] complexion and the pronunciation of [her] name." (*Id.* at PageID## 2494–95.)

Specifically, she averred that her fellow jurors "discounted and totally disregarded Mr. Harden's testimony in particular and his case in general because they believed he was a crack

---

[1]Based on the delay between the end of trial and Harden's counsel's Motion for Leave of Court, the dissent speculates that the jury's comments might have only played a minimal role in deliberations. But although Harden's counsel first informed the court about the juror two months after trial, the record does not reflect when the juror expressed her concerns to her stepfather or when her stepfather contacted Harden's counsel.

addict, and that his intent was to start trouble with Officer Hillman so he could sue the police department and get some money," and that "[t]hey discredited his testimony and attributed the calmness he showed in describing the events by claiming that he was taking dope or drinking during breaks in the trial." (*Id.* at PageID# 2495.) T.H. further alleged that the jurors "took verbatim what Mr. Hillman's [white] attorney said but described [Harden's African American lawyer] and his team as the 'Cosby Show.'" (*Id.*) T.H. sought to remind her fellow jurors that their job was to decide whether Hillman had used excessive force; however, the jurors "kept saying he just wants money; he's a crack head; he's an alcoholic; look at his wife, she's nodding off; she looks like she's on heroin." (*Id.*) When T.H. explained that she was a nurse and that Harden "wouldn't be able to stay in the courtroom all these hours and stay focused if he was on drugs," members of the jury replied, "you don't know what he's doing on breaks," which T.H. understood to indicate a belief that Harden was "taking a swig during breaks to stay calm." (*Id.*) T.H. concluded: "It is my very firm and absolute belief that Mr. Harden did not get a fair trial because of his race and racial stereotyping. Furthermore, there is absolutely no doubt in my mind that the race of the lawyers was a significant factor. The jurors hung on [to Hillman's counsel's] every word but gave no consideration at all to [Harden's counsel's] points." (*Id.* at PageID# 2497.)

On a note unrelated to race, T.H. explained that one of the jurors "concealed from the judge that he was the son or grandson of a police commander or officer on a police department." (*Id.* at PageID# 2496.) And when the jury eventually turned to the issue of excessive force, this juror explained that Hillman's force was not excessive because police have the right to use "force one step above what it takes to subdue a person." (*Id.*) According to T.H., the jury was "absolutely persuaded by that and used it over and over again during the deliberation." (*Id.*)

The district court then granted Hillman's motion to exclude T.H.'s affidavit and denied Harden's motion for a new trial. The district court explained that Federal Rule of Evidence 606(b) generally bars the introduction of evidence about jury deliberations, and that none of the exceptions to this no-impeachment rule applied.

This timely appeal followed.

**DISCUSSION**

**I.      Summary Judgment on Harden's Claim That He Was Arrested Without Probable Cause**

"We review a grant of summary judgment *de novo*, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Const., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (quoting *Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011)).  "Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014) (citing Fed. R. Civ. P. 56(a) & (c)).  "The moving party bears the burden of showing that no genuine issues of material fact exist." *Scott v. First S. Nat'l Bank*, 936 F.3d 509, 516–17 (6th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986)). "Whether a fact is 'material' depends on whether its resolution might affect the outcome of the case." *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Payne*, 767 F.3d at 530 (citing *Anderson*, 477 U.S. at 251–52).

Harden argues that the district court erred in granting summary judgment on his claim that Hillman violated his Fourth Amendment right to be free from arrest without probable cause.[2] "[S]tate law defines the offense for which an officer may arrest a person, while federal law dictates whether probable cause existed for an arrest." *Kennedy v. City of Villa Hills, Ky.*, 635 F.3d 210, 215 (6th Cir. 2011).  "Probable cause exists if the facts and circumstances known

---

[2]In his brief, Harden argues that the district court erred in granting summary judgment to both Hillman and Heritage Creek because there was no probable cause for Hillman to arrest him.  However, the district court granted summary judgment to Heritage Creek on Count I on an entirely different basis—that *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), foreclosed holding Heritage Creek vicariously liable, and that Harden had "presented no facts upon which a reasonable juror could conclude that Heritage Creek failed to train or supervise Hillman." (Mem. & Op., R. 103 at PageID## 1410–11.)  Because Harden has not raised any errors related to the district court's actual basis for granting summary judgment to Heritage Creek on Count I, he has forfeited any arguments that the district court erred.  *See Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007); *Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2008).

to the officer warrant a prudent man in believing that the offense has been committed." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 772 (6th Cir. 2014) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Everson v. Leis*, 556 F.3d 484, 498–99 (6th Cir. 2009) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)).

The district court held that Hillman had probable cause to arrest Harden for the Kentucky offense of criminal trespass in the third degree. Although neither party raises the issue, under Kentucky law, criminal trespass in the third degree is only applicable when a "defendant enter[s] upon the victim's unimproved land." *Colwell v. Commonwealth*, 37 S.W.3d 721, 726–27 (Ky. 2000). However, Kentucky law provides that "[a] person is guilty of criminal trespass in the second degree when he knowingly enters or remains unlawfully in a building. . . ." Ky. Rev. Stat. § 511.070(1). Whether Hillman's intent was to arrest Harden for criminal trespass in the second or third degree, (*Compare* Hillman Dep., R. 153 at PageID# 2007 (labeling Harden's actions criminal trespass in the third degree), *with id.* at PageID# 2008 ("I advised him that it was criminal trespass II")), is of no import because the "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see also Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020) ("The Supreme Court has held that the reason the officer gives for an arrest need not be the reason which actually provides probable cause for the arrest."). Thus, the appropriate inquiry is whether probable cause existed for Hillman to arrest Harden for the offense of criminal trespass in the second degree.

For purposes of criminal trespass in the second degree, "[a] person 'enters or remains unlawfully' in or upon premises when he is not privileged or licensed to do so." Ky. Rev. Stat. § 511.090(1); *see also Howard v. Spradlin*, 562 S.W.3d 281, 285 (Ky. Ct. App. 2018). A person who "defies a lawful order not to enter or remain personally communicated to him by the owner of such premises or other authorized person" lacks a privilege or license to remain on the premises. *Id.* § 511.090(2); *see also Lewis v. Commonwealth*, 392 S.W.3d 917, 920 (Ky. 2013).

Harden argues that Hillman was not authorized to revoke his license to enter or remain on Thorntons property and, accordingly, that Hillman lacked probable cause to arrest him when he reentered the store. However, Dale Wright, a Thorntons regional manager, testified that Hillman was hired to provide "[s]ecurity" for Thorntons, and that Thorntons did not "define a [role] or responsibility for the security services that were provided." (Wright Dep., R. 155 at PageID## 2054, 2058.) Although Harden argues that, according to Wright, the "only expectations that [Thorntons] had of Hillman was his presence in a uniform to deter theft," (Appellant Br. at 6), Wright testified that Thorntons expected "Hillman to exercise his discretion in conducting security work." (Wright Dep., R. 155 at PageID# 2066.) And Chief of Police Perry testified that security work encompasses "watching out for shoplifters, disorderly subjects, intoxicated people. The list, you know, I could go on and on . . . basically any violation of any law." (Perry Dep., R. 154 at PageID# 2035.) Therefore, contrary to Harden's assertions, the undisputed evidence establishes that a reasonable person in Hillman's position would have believed himself authorized to revoke Harden's license to be in Thorntons. Because the undisputed evidence also shows that Harden knowingly reentered Thorntons, probable cause existed to conclude that Harden committed the offense of criminal trespass in the second degree. *See Helms v. Zubaty*, 495 F.3d 252, 259 (6th Cir. 2007). Accordingly, the district court did not err in granting summary judgment to Hillman.

## II.     Harden's First Motion for a New Trial

"We review the denial of a party's motion for a new trial for abuse of discretion." *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 434 (6th Cir. 2009) (citing *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 820 (6th Cir. 2000)). "The district court abuses its discretion when it relies on clearly erroneous findings of fact, uses an erroneous legal standard, or improperly applies the law." *United States v. Lawrence*, 555 F.3d 254, 261 (6th Cir. 2009) (quoting *United States v. White*, 492 F.3d 380, 408 (6th Cir. 2007)). "Reversal is only warranted if the Court has a 'definite and firm conviction that the trial court committed a clear error of judgment.'" *Nolan v. Memphis City Sch.*, 589 F.3d 257, 264 (6th Cir. 2009) (quoting *Barnes*, 201 F.3d at 820).

"Under Federal Rule of Civil Procedure 59, a new trial is required when the original trial was unfair to the moving party in some fashion." *Mich. First Credit Union v. Cumis Ins. Soc., Inc.*, 641 F.3d 240, 248 (6th Cir. 2011) (cleaned up). In his first motion for a new trial, Harden argued that the district court's "refusal to exercise its plenary authority" to "order the Marshal[] to serve the subpoenas . . . deprived [him] of his right and privilege to the [Marshals] service" and, "[a]s a result, he was deprived of a fair trial" when several of his witnesses failed to appear. (Mot. for a New Trial, R. 181 at PageID# 2298.) On appeal, Harden argues that he was deprived of due process and his right to a fair trial because "[i]t is simply incomprehensible that the Marshals Service can take subpoenas and a check to pay for them to be served, and callously ignore them, not even extending the courtesy and decency to contact counsel and alert him if there was a problem." (Appellant Br. at 19.)

However, "Federal Rule of Civil Procedure 45 grants a district court the power to issue subpoenas as to witnesses and documents," *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 76 (1988), and provides that "[a]ny person who is at least 18 years old and not a party may serve a subpoena," Fed. R. Civ. P. 45(b)(1). To be sure, as Harden argues, the Marshals Service "is not excluded from serving subpoenas." (Appellant Br. at 19.) But Harden has provided no support for his proposition that, as a nonindigent plaintiff, he had *a right* to have his subpoenas served by the Marshals Service. *See* 28 U.S.C. § 1915(d). Moreover, as nothing stopped Harden's counsel from hiring a process server to serve his witnesses with subpoenas, as he eventually did, the district court's refusal to order the Marshals Service to serve Harden's subpoenas did not deny him a fair trial. Therefore, the district court did not abuse its discretion in denying Harden's claim.

In his first motion for a new trial, Harden also argued that Hillman's counsel made improper arguments to the jury at trial. Because "the determination of the extent of permissible comment and argument by counsel rests primarily in the judicial discretion of the lower court," this Court has held that "the power to set aside verdict for misconduct of counsel should be sparingly exercised on appeal." *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980) (quoting *Twachtman v. Connelly*, 106 F.2d 501, 509 (6th Cir. 1939)). "In considering whether allegedly improper attorney statements merit a new trial, we analyze the

totality of the circumstances," and "[e]ven if the statements are improper, [a party is] not entitled to a new trial unless 'there is a reasonable probability that the verdict of the jury has been influenced by such conduct.'" *CFE Racing Prod., Inc. v. BMF Wheels, Inc.*, 793 F.3d 571, 590 (6th Cir. 2015) (quoting *Balsley v. LFP, Inc.*, 691 F.3d 747, 761 (6th Cir. 2012)).

Harden argues that various comments by Hillman's counsel referencing his lack of supporting witnesses were improper because Hillman's counsel "knew that [Harden's] counsel had issued subpoenas for the Marshals Service to execute but they refused to serve them" and that "Harden's counsel hired a process server who successfully served some key witnesses, but they did not appear."[3]  (Appellant Br. at 12–13, 15.)  However, considering that Harden had the burden to prove his claim, it was not improper for Hillman's counsel to point out the paucity of evidence that Harden presented at trial.  Therefore, there was no reversible error, and a new trial was not required.

## III.    T.H.'s Affidavit and Harden's Second Motion for a New Trial

Harden argues that the district court erred by not declaring a mistrial after learning from T.H.'s affidavit that: 1) a juror provided the jury with an incorrect statement of the law; 2) the same juror concealed during *voir dire* that his father or grandfather was a member of the local police department; and 3) members of the jury relied on racial stereotypes in reaching the verdict.

"By the beginning of [the twentieth] century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Tanner v. United States*, 483 U.S. 107, 117 (1987) (citation omitted).  Based on the common law rule, Federal Rule of Evidence 606(b)(1) provides that:

---

[3]Because Harden concedes that "he has not been able to find . . . in the trial transcripts" what he calls "[p]erhaps the most inexcusable comments," (Appellant Br. at 13 & n.3), we do not address those comments. *See* Fed. R. App. P. 10(b); *see also Hawley v. City of Cleveland*, 24 F.3d 814, 822 (6th Cir. 1994); *Spurling v. Allstate Indem. Co.*, 487 F. App'x 982, 983 (6th Cir. 2012).  The remaining two comments quoted in Harden's brief relate to argument about the Thorntons cashier's belief that Harden had been drinking and the offenses for which Hillman eventually charged Harden with violating.  But because these "[i]ssues [are] adverted to in a perfunctory manner, without some effort to develop an argument" they "are deemed forfeited." *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013) (citing *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). The Rule contains three exceptions for when: "(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b)(2).

### A. The Allegation That a Juror Provided the Jury with an Incorrect Legal Standard

Harden argues that a juror's instruction of a purportedly incorrect legal standard for excessive force constituted extraneous prejudicial information that was improperly brought to the jury's attention. "Generally speaking, information is deemed 'extraneous' if it derives from a source 'external' to the jury." *Warger v. Shauers*, 574 U.S. 40, 51 (2014) (quoting *Tanner*, 483 U.S. at 117). "'External' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." *Id.* (citations omitted). Thus, "preconceived notions or beliefs about the legal system" are not considered to be derived from an external source. *Smith v. Nagy*, 962 F.3d 192, 204 (6th Cir. 2020); *see also United States v. Ewing*, 749 F. App'x 317, 322 (6th Cir. 2018) ("A juror's statement suggesting that the jury misunderstood or misapplied instructions or the law is . . . typically considered internal and therefore subject to Rule 606(b)'s bar."). Without any indication from T.H.'s affidavit that the legal standard articulated by the juror was derived from an external source, the district court did not abuse its discretion in holding that Rule 606(b) barred its consideration of this evidence. *See United States v. Lanier*, 870 F.3d 546, 549 (6th Cir. 2017) (explaining that it is an abuse of discretion for a district court to fail "to investigate a colorable claim of external influence on the jury").

**B. The Allegation That a Juror Lied During *Voir Dire***

Turning to the allegation about a juror lying during *voir dire*, direct Supreme Court precedent forecloses Harden's argument. In *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), a personal injury suit, the plaintiff filed a motion for a new trial based on a juror failing to disclose during *voir dire* that his son had sustained a severe injury. *See id.* at 550. The Supreme Court held that "to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556; *see also Lang v. Bobby*, 889 F.3d 803, 812 (6th Cir. 2018).

However, in *Warger v. Shauers*, another personal injury suit, the Supreme Court held "that Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*." 574 U.S. at 44. While recognizing that the "Constitution guarantees both criminal and civil litigants a right to an impartial jury," the Court explained that "a party's right to an impartial jury remains protected despite Rule 606(b)'s removal of one means of ensuring that jurors are unbiased" because "[e]ven if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." *Id.* at 50–51. Because Harden's claim that one of the jurors lied during *voir dire* is based solely on juror testimony, the district court correctly held that Rule 606(b) barred consideration of that testimony.

**C. The Allegation That the Jury's Verdict was Motivated by Racial Stereotypes**

Pursuant to Rule 606(b), courts are unable to consider a juror's testimony that members of the jury relied on racial stereotypes in reaching the verdict. But the exceptions listed in Rule 606(b) are not the only situations where it is permissible for a court to consider juror testimony. The Supreme Court in *Warger* left open the possibility that Rule 606(b) would not foreclose the consideration of juror testimony to ensure an impartial jury "in cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." *Id.* at 51 n.3. The Court

explained that "[i]f and when such a case arises, the Court can consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Id.*

Three years later, in *Pena-Rodriguez v. Colorado*, ___ U.S. ___, 137 S. Ct. 855 (2017), such a case arose. *See id.* at 867. During the jury deliberations in Pena-Rodriguez's criminal trial for sexual assault, one juror made several racist statements about Mexican men and sexual assault, including that he "believed the defendant was guilty because, in [his] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." *Id.* at 862. The question before the Court was whether a case where "a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt" was an example of the extreme situation referred to in *Warger* "where the Constitution requires an exception to the no-impeachment rule." *Id.* at 867.

To answer this question, the Supreme Court explained that the Fourteenth Amendment contains an "imperative to purge racial prejudice from the administration of justice." *Id.* The Court explained that, in line with this imperative, "[t]ime and again, this Court has been called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system." *Id.* This has included interpreting the Fourteenth Amendment to "prohibit the exclusion of jurors on the basis of race" and "repeatedly [striking] down laws and practices that systematically exclude racial minorities from juries," including the practice of litigants in both criminal and civil cases to exercise peremptory challenges to exclude "prospective juror[s] on the basis of race." *Id.* at 867–68 (collecting cases). According to the Court, "[t]he unmistakable principle underlying these precedents is that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" *Id.* at 868 (quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979)).

While on the surface the Supreme Court's "decisions endorsing the no-impeachment rule and its decisions seeking to eliminate racial bias in the jury system," appeared to conflict, the Court held that "[t]he two lines of precedent . . . need not conflict." *Id.* The Court explained that its precedents affirming the no-impeachment rule "each involved anomalous behavior from a single jury—or juror—gone off course," and were based on the proposition that an "attempt to rid the jury of every irregularity of this sort would be to expose it to unrelenting scrutiny" that

the jury system would be unlikely to survive. *Id.* However, the Court explained that this concern did not apply to racial bias, which is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Id.* Therefore, "[a]n effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy." *Id.* Thus, the Court held "that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." *Id.* at 869.

Although *Pena-Rodriguez*'s holding cited the Sixth Amendment, which only applies to criminal prosecutions, the Supreme Court's reasoning and precedent demonstrate that the holding applies equally to civil cases. As an initial matter, the Supreme Court's cases dealing with the no-impeachment rule in the civil context have consistently left open the possibility of exceptional cases where the rule would not apply. In *McDonald v. Pless*, 238 U.S. 264 (1915), the Supreme Court's seminal case establishing the broad no-impeachment rule, the Court recognized that there might be exceptions "in the gravest and most important cases." *Id.* at 269. And as explained above, almost one hundred years later, the Supreme Court explained in *Warger* that there might be exceptions to the no-impeachment rule in "cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." 574 U.S. at 51 n.3. *Pena-Rodriguez* explicitly relied on this line of precedent. *See* 137 S. Ct. at 866–67 ("Today, . . . the Court faces the question that *Reid*, *McDonald*, and *Warger* left open.").

Moreover, because the *Warger* Court held that "[t]he Constitution guarantees both criminal and civil litigants a right to an impartial jury," we see no principled basis for limiting *Pena-Rodriguez*'s holding to criminal cases. 574 U.S. at 50. As explained above, *Pena-Rodriguez* was based on the principle derived from the Fourteenth Amendment "that discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" 137 S. Ct. at 868 (quoting *Rose*, 443 U.S. at 555). And while

*Pena-Rodriguez* happened to deal with a criminal case, the Supreme Court has made it clear that this principle also applies in civil cases.

Five years after the Supreme Court held in *Batson v. Kentucky*, 476 U.S. 79 (1986), that peremptory challenges could not be exercised to exclude potential jurors on the basis of race, the Supreme Court held in *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991), that *Batson* was "not limited to the criminal sphere." *Id.* at 630. In support of this holding, the Court explained that "[a] civil proceeding often implicates significant rights and interests. Civil juries, no less than their criminal counterparts, must follow the law and act as impartial factfinders. And, as we have observed, their verdicts, no less than those of their criminal counterparts, become binding judgments of the court." *Id.* Accordingly, the Supreme Court held that "[r]acial discrimination has no place in the courtroom, whether the proceeding is civil or criminal. . . . The Constitution demands nothing less." *Id.* (citing *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946)); *see also Warger*, 574 U.S. at 50. Therefore, the Supreme Court's precedents establishing a civil litigant's right to an impartial jury and the need to eradicate racial discrimination from the civil courtroom supports holding that *Pena-Rodriguez* applies to civil cases.

Finally, *Pena-Rodriguez* did not merely decline to apply the no-impeachment rule to evidence of racial bias. Instead, the Supreme Court explained that the entire rationale for the no-impeachment rule does not apply to evidence of racial bias. The Court recognized that, although the no-impeachment rule ordinarily protects the jury system, the "unique historical, constitutional, and institutional concerns" surrounding racial bias means that applying the no-impeachment rule to such evidence "would risk systemic injury to the administration of justice." *Pena-Rodriguez*, 137 S. Ct. at 868. The Supreme Court also explained that the normal safeguards protecting the right to an impartial jury are not as effective when it comes to racial bias because the "stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." *Id.* at 869. Therefore, because *Pena-Rodriguez* held that the no-impeachment rule has no place when it comes to evidence of racial bias, and considering the Supreme Court's precedent establishing the need to

eliminate racial discrimination from the civil courtroom, we hold that the no-impeachment rule must give way to evidence of racial bias in civil cases.

Although the Sixth Amendment is unavailable, as it was in *Pena-Rodriguez*, to fulfill the Constitution's demand that racial discrimination be eliminated from the civil courtroom, the Fourteenth Amendment's guarantee of "equal protection of the laws" provides a sufficient basis to extend *Pena-Rodriguez* to civil cases.[4]  "[T]he central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States," *Pena-Rodriguez*, 137 S. Ct. at 867 (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)), and the purpose of the Equal Protection Clause is "to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents,"[5] *Green*, 654 F.3d at 650 (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)).  Thus, as detailed in *Pena-Rodriguez*, the Supreme Court has repeatedly invoked the Fourteenth Amendment in its efforts to root out discrimination from the jury system.  *See* 137 S. Ct. at 867–68; *see also Edmonson*, 500 U.S. at 628 (holding that in a civil case the "exclusion on account of race violates a prospective juror's equal protection rights").[6]

Holding that the no-impeachment rule must give way to a civil litigant's equal protection rights when jurors rely on racial stereotypes or bias in the deliberation room does not end the

---

[4]"Although the Fourteenth Amendment applies on its face only to the states, the Due Process Clause of the Fifth Amendment imposes equal protection constraints on the federal government."  *United States v. Green*, 654 F.3d 637, 650–51 (6th Cir. 2011) (citing *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954)).  "We evaluate equal protection claims against the federal government under the Fifth Amendment just as we would evaluate equal protection claims against state and local governments under the Fourteenth Amendment."  *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (citing *United States v. Angel*, 355 F.3d 462, 471 (6th Cir. 2004)).

[5]The Fourteenth Amendment's state action requirement is satisfied here because a civil jury "is a quintessential governmental body, having no attributes of a private actor.  The jury exercises the power of the court and of the government that confers the court's jurisdiction."  *Edmonson*, 500 U.S. at 624.

[6]We have held that "[t]he right to an impartial jury in civil cases is inherent in the Seventh Amendment's preservation of a 'right to trial by jury' and the Fifth Amendment's guarantee that 'no person shall be denied of life, liberty or property without due process of law.'"  *McCoy v. Goldston*, 652 F.2d 654, 657 (6th Cir. 1981) (quoting *Kiernan v. VanSchaik*, 347 F.2d 775, 778 (3rd Cir. 1965)).  Nonetheless, because the Supreme Court has relied on the Fourteenth Amendment in similar cases, *see Edmonson*, 500 U.S. at 628, and because the Seventh Amendment has not been incorporated against the states, *see McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 765 n.13 (2010), we hold that the principle set forth in *Pena-Rodriguez* extends to civil cases based on the Fourteenth Amendment.

discussion of Harden's claim.    In *Pena-Rodriguez*, the Supreme Court explained that "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry."  137 S. Ct. at 869; *see also United States v. Robinson*, 872 F.3d 760, 770 (6th Cir. 2017).  Instead, "there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict," and, "[t]o qualify, the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict."  *Id.*  The Court also explained that "[w]hether that threshold showing has been satisfied is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence."  *Id.*

The district court assumed without deciding that *Pena-Rodriguez* applies to civil cases but held that Harden failed to make "a sufficient showing that one or more jury members made statements exhibiting overt racial bias thus, casting serious doubt on the fairness and impartiality of the jury's deliberations and verdict."  (Order, R. 206 at PageID# 2530.)  In line with that holding, the district court granted Hillman's motion to exclude T.H.'s affidavit and denied Harden's second motion for a new trial.  Therefore, the relevant issue turns to whether Harden correctly argues that the district court abused its discretion in holding that T.H.'s affidavit did not make the requisite showing—that racial stereotypes or bias significantly motivated the vote cast by at least one of her fellow jurors—to require consideration of the evidence and any resulting equal protection violation.

According to T.H.'s affidavit, her fellow jurors "discounted and totally disregarded Mr. Harden's testimony in particular and his case in general because they believed he was a crack addict, and that his intent was to start trouble with Officer Hillman so he could sue the police department and get some money."  (Aff. of T.H. Juror, No. 010145, R. 201-1 at PageID# 2495.)    T.H. also alleged that the jury discredited Harden's "testimony and attributed the calmness he showed in describing the events by claiming that he was taking dope or drinking during breaks in the trial."  (*Id.*)  Harden was allegedly labeled a "crack head" and "an alcoholic" by members of the jury, and a juror told T.H. that "you don't know what he's doing on breaks,"

which T.H. understood to indicate a belief that Harden was "taking a swig during breaks to stay calm." (*Id.*) And jurors stated that Harden's romantic partner looked like she was "on heroin." (*Id.*) Finally, T.H. averred that the jury described Harden's African American attorney and his team as the "Cosby Show" and "gave no consideration at all" to Harden's attorney's arguments. (*Id.* at PageID## 2495, 2497.)

Little needs to be said about the pervasive and harmful racial stereotypes regarding African Americans and drugs, and specifically, crack cocaine. Over one hundred years ago, advocates for the "[t]he Harrison Narcotic Drug Act, America's first comprehensive anti-drug legislation," gathered support by using "blatant racial politics." William Spade, Jr., *Beyond the 100:1 Ratio: Towards A Rational Cocaine Sentencing Policy*, 38 ARIZ. L. REV. 1233, 1245–46 (1996). For example, during his speech to Congress, Dr. Hamilton Wright warned that "the use of cocaine by the negroes of the South is one of the most elusive and troublesome questions which confront the enforcement of the law in most of the Southern states." *Id.* at 1246 (citation omitted). "During the Act's passage, Congress quoted a 1910 report by Dr. Wright to the International Opium Commission which stated that cocaine was 'a potent incentive in driving humbler negroes all over the country to abnormal crimes.'" *Id.* at 1246–47 (internal citation and quotation omitted). Thus, Dr. Wright's report "helped to create the stereotype of the black man as a drug addict." *Id.* at 1246.

In the mid-1980s, there was a strategic effort to build public and legislative support for the War on Drugs. *See* MICHELLE ALEXANDER, THE NEW JIM CROW 5 (2010). As a result, "the media was saturated with images of black 'crack whores,' 'crack dealers,' and 'crack babies,'—images that seemed to confirm the worst negative racial stereotypes about impoverished inner-city residents." *Id.*; *see also* David A. Sklansky, *Cocaine, Race, and Equal Protection*, 47 STAN. L. REV. 1283, 1293 (1995) (explaining that "[w]hites strongly associated crack with the same minority group they linked with heroin—inner city blacks."). "The media bonanza inspired by the . . . campaign solidified in the public imagination the image of the black drug criminal." *Id.* at 105; *see also* Jelani Jefferson Exum, *From Warfare to Welfare: Reconceptualizing Drug Sentencing During the Opioid Crisis*, 67 U. KAN. L. REV. 941, 947 (2019). For example, although African Americans constitute only 15 percent of drug users, in a

study that asked participants to close their eyes and "envision a drug user, . . . [n]inety-five percent of respondents pictured a black drug user." *Id.* at 106; *see also id.* at 127 (discussing a study showing that the Seattle Police Department's drug enforcement efforts reflected "a racialized conception of the drug problem" that focused "heavily on crack"); Lis Wiehl, *"Sounding Black" in the Courtroom: Court-Sanctioned Racial Stereotyping*, 18 HARV. BLACKLETTER L.J. 185, 186, 202–03 (2002) (stating that crack cocaine is "a drug predominately associated with African Americans.").

According to T.H.'s affidavit, members of the jury engaged in exactly this racial stereotype. Although the district court held that T.H.'s affidavit does not "show that any statements were made by other jurors that exhibited overt racial bias," (Order, R. 206 at PageID# 2530), T.H.'s affidavit alleges that members of the jury believed that Harden was a "crack addict" who intended "to start trouble with Officer Hillman so he could sue the police department and get some money." (Aff. of T.H. Juror, No. 010145, R. 201-1 at PageID# 2495.) Simply because Harden's romantic partner nodded off during the trial, the jury assumed that she was on heroin. As the preceding discussion shows, the jury's wholly unsupported belief that Harden and his romantic partner were hard drug users demonstrates overt racial bias.[7] And the jury's characterization of Harden's African American legal team as the "Cosby Show"—a reference to a comedy show with an African American cast—only bolsters this conclusion.

Nonetheless, even though *Pena-Rodriguez* established that "racial bias in the justice system must be addressed," because the allegations in T.H.'s affidavit require an inference to conclude that they are about race, the dissent argues that the statements are an example of what the Supreme Court characterized as "offhand comment[s]"—as opposed to "statements exhibiting overt racial bias"—that are not sufficient to overcome the no-impeachment bar. *Pena-Rodriguez*, 137 S. Ct. at 869. In other words, the dissent appears to suggest that, unless a juror's statement explicitly references race in relation to their vote—for example, the juror's statement

---

[7]The dissent seeks to excuse the jury's reliance on this pernicious stereotype as to *both* Harden and his romantic partner by pointing to a single sentence of testimony establishing that, in 1987, Harden was discharged from the military after he failed a drug test for marijuana. However, the existence of a single 32-year-old failed drug test for marijuana does not demonstrate that the jury's comments were not racially motivated—especially considering the jury's comments about Harden's romantic partner and legal team, as well as T.H.'s understanding of the comments.

in *Pena-Rodriguez* that the defendant was guilty "because he's Mexican and Mexican men take whatever they want"—the statement is merely an offhand comment. *Id.* at 862.

However, according to the Supreme Court, a juror's statement is an "offhand comment" when it "indicat[es]" that the juror harbors personal "racial bias or hostility" without showing "that racial animus was a significant motivating factor in the juror's vote to convict." *Id.*; *see also Robinson*, 872 F.3d at 771 (holding that racial statements directed at a fellow juror, as opposed to a party in the case, constituted offhand comments because there was no indication that the juror's racial animus motivated her vote). But when the juror's statement indicates that racial bias played a role in the juror's vote, nothing in *Pena-Rodriguez* limits the definition of "overt racial bias" to situations as extreme as the one presented by the facts in that case. Instead, the *Pena-Rodriguez* exception to the no-impeachment rule is triggered where, as here, there is "a clear statement that *indicates*" that a juror "relied on racial stereotypes or animus," *i.e.*, "overt racial bias," when casting their vote. *Id.* at 869 (emphasis added).

Our recent decision in *United States v. Brooks*, 987 F.3d 593 (6th Cir. 2021), also fails to support the dissent's argument. In *Brooks*, an African American juror sent an email to the court which "indicated that she felt pressured to return a verdict against Brooks and that the other jurors had sided with the police." *Id.* at 597. But the "email did not even mention race, let alone suggest that other jurors made race-based remarks." *Id.* at 604. That is, there was not even an allegation of an offhand comment indicating that any jurors harbored personal feelings of racial bias or hostility. We therefore held that *Pena-Rodriguez* "require[s] express statements of racial animus, not neutral statements that may suggest unexpressed racial biases." *Id.* at 604–05. Thus, *Brooks* stands for the unremarkable proposition that *Pena-Rodriguez* requires some statement indicating that a juror relied on racial stereotypes or animus when reaching the verdict.

Unlike the "neutral statements" in *Brooks* that had no racial connotations whatsoever, as explained above, T.H.'s affidavit alleges express statements indicating that jurors engaged in racial stereotypes and animus. *Id.* And, unlike in *Robinson*, the affidavit alleges that the jury's verdict was motivated by the jury's racial bias. The district court held that Harden's claims

"were exceedingly weak," but that was not the jury's basis for its verdict.[8]  (Order, R. 206 at PageID# 2530.)   Instead, members of the jury allegedly "discounted and totally disregarded" Harden's testimony and "his case in general" because they believed him to be a "crack addict" who was seeking a payout.  (Aff. of T.H. Juror, No. 010145, R. 201-1 at PageID# 2495.) Members of the jury even intimated that Harden's calm demeanor while testifying—which easily could have been viewed as a sign that he was telling the truth—indicated that he was using drugs during breaks in the trial.   Jurors also allegedly "gave no consideration at all" to Harden's African American lawyer's arguments on account of his race.  The principle that "discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice,'" applies to these allegations even if, as the district court held, the evidence at trial weighed heavily against Harden.  *Pena-Rodriguez*, 137 S. Ct. at 868 (quoting *Rose*, 443 U.S. at 555).

In sum, T.H.'s affidavit suffices to show that "one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict."  *Id.* at 869.  The alleged juror statements "were egregious and unmistakable in their reliance on racial bias" and show that racial stereotypes about African Americans and drugs were a "significant motivating factor" in the jury's verdict.[9]  *Id.* at 869–870.  Accordingly, the district court abused its discretion in excluding T.H.'s affidavit.

## D. The Procedures and Standard to Apply on Remand

Although *Pena-Rodriguez* held that the no-impeachment rule cannot bar consideration of evidence showing that jurors relied on racial stereotypes to reach their verdict, the Supreme Court did not address "what procedures a trial court must follow when confronted with a motion for a new trial based on juror testimony of racial bias" and "the appropriate standard for determining when evidence of racial bias is sufficient to require that the verdict be set aside and

---

[8]To be sure, T.H. also voted in favor of Hillman. But jurors can rely on different reasons for their vote, and one juror relying on the evidence does not mean that other jurors who reached the same verdict did not rely on racial stereotypes.

[9]Hillman argues that none of the jurors could have been motivated by racial bias because he is also African American.  However, there is nothing inconsistent with a juror harboring and expressing racial stereotypes about African Americans and drugs as to Harden but not applying those same stereotypes to a police officer.

a new trial be granted." 137 S. Ct. at 870–71 (citations omitted). However, based on the Supreme Court's decision in *Remmer v. United States*, 347 U.S. 227, 229–30 (1954), this Court has set forth such standards and procedures in the context of the Rule 606(b) exceptions to the no-impeachment rule, and we see no reason to distinguish between those exceptions and the exception derived from *Pena-Rodriguez*. *See Lanier*, 870 F.3d at 551.

Thus, because T.H.'s affidavit raises a "colorable claim" that members of the jury relied on racial stereotypes in reaching their verdict, the district court must hold a *Remmer* hearing to allow Harden a meaningful "opportunity to establish actual bias." *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (quoting *United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998)); *see also McCoy*, 652 F.2d at 659. "[A]ll interested parties [must be] permitted to participate" in the hearing, *United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005) (quoting *Remmer*, 347 U.S. at 230), and, "[d]uring the hearing, attorneys for each side should have the opportunity to question [T.H.] and the rest of the jury to determine whether [racial stereotypes or bias] affected the jury's deliberations," *Lanier*, 870 F.3d at 551; *see also United States v. Lanier*, 988 F.3d 284, 295 (6th Cir. 2021). And if the hearing reveals that racial bias or stereotypes "prejudicially affected jury deliberations," Harden would be entitled to a new trial. *Id.*; *see also Krause v. Rhodes*, 570 F.2d 563, 570 (6th Cir. 1977).

## CONCLUSION

For these reasons, we **AFFIRM** the district court's grant of summary judgment to Hillman on Harden's claim that he was arrested without probable cause, **AFFIRM** the district court's order denying Harden's first Motion for New Trial, **VACATE** the district court's order denying Harden's second Motion for New Trial, and **REMAND** with instructions to conduct a *Remmer* hearing to investigate juror bias and grant a new trial if juror bias is found.

_____

**CONCURRING IN PART AND DISSENTING IN PART**
_____

SUHRHEINRICH, Circuit Judge, concurring in part and dissenting in part.

Although I am largely in agreement with the majority, I disagree that the juror statements at issue meet the very narrow exception to the no-impeachment rule of Federal Rule of Evidence 606(b) set forth by the Supreme Court in *Pena-Rodriguez v. Colorado.* 137 S. Ct. 855 (2017). I therefore do not believe that the district court abused its discretion by declining to order a *Remmer* hearing. For this reason, I dissent as to part III(C).

In *Pena-Rodriguez* the Supreme Court recognized an exception to the no-impeachment rule in order to combat "the most grave and serious statements of racial bias" in juror deliberations and emphasized that it should be "limited to rare cases." *Id.* at 869-71. The test created by the Court gives effect these exhortations. To overcome Rule 606(b), the juror statements must (1) exhibit "overt racial bias," (2) "cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict," *and* (3) demonstrate that "racial animus was a *significant* motivating factor in the juror's vote to convict." *Id.* at 869 (emphases added).

The defendant in *Pena-Rodriguez* was charged with criminal sexual assault. A juror allegedly said that he believed the defendant was guilty "because he's Mexican and Mexican men take whatever they want," that "in [his] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe that they could do whatever they wanted with women," and that "nine times of out of ten Mexican men were guilty of being aggressive toward women and young girls." *Id.* at 862. That same juror also allegedly said that "he did not find the alibi witness credible because, among other things, the witness was 'an illegal.'" *Id.* The Supreme Court held that "the alleged statements by a juror were egregious and unmistakable in their reliance on racial bias." *Id.* at 870. The Court found that "[n]ot only did [the juror] deploy a racial stereotype to conclude petitioner was guilty and his alibi witness should not be believed, but he also encouraged other jurors to join him in convicting on that basis." *Id.* The

Court therefore concluded that Rule 606(b) does not impose an absolute bar to juror-impeachment "[w]hen jurors disclose an instance of racial bias as serious as the one involved in this case." *Id.* at 870.

Not one of the alleged statements at issue clears this high hurdle. The affidavit submitted by juror T.H. claims that other jurors made comments that Harden was not credible because (1) he was "a crackhead," (2) he was "an alcoholic," (3) his wife "look[ed] like she's on heroin," (4) he could have been "taking swigs during breaks to stay calm," (5) his legal team resembled "the Cosby Show," and that (6) "his intent was to start trouble with Officer Hillman so he could sue the police department and get some money." Certainly, these statements exhibit predilections unfavorable to Harden. But they are all based on Harden's perceived *vices*—addictions and greed—not his *race*. Although the Cosby Show comment comes somewhat closer to the racial bias bullseye, it does not directly reference the jurors' beliefs about Harden: one must infer that because the jurors thought that Harden's African American legal team was comical, they also thought Harden was not credible because of his race. This is clearly not the type of *overt* racial bias the Supreme Court condemned in *Pena-Rodriguez*, but rather the type of "off-hand comment" the Court said did not meet the threshold. 137 S. Ct. at 869. As we recently held in *United States v. Brooks*, *Pena-Rodriguez* "must be taken at its word: to require *express* statements of racial animus, not *neutral* statements that may suggest unexpressed racial biases." —F.3d—, No. 19-2283, 2021 WL 451010, at *7 (6th Cir. Feb. 9, 2021) (holding that *Pena-Rodriguez* did not require an exception to the no-impeachment rule where a juror alleged that other jurors relied too heavily on testimony from police officers and "pressured" and "berated" her to vote to convict).

This is also true of the statement the majority hangs its hat on, the "crackhead" reference, which the majority claims automatically equates to a stereotype about African Americans. But again, I do not perceive the reference as inexorably equating to race, especially since the jury could have thought that someone they perceived to have a drug addiction might not be credible. Even if there is some historical support for the majority's suggestion that the term "crackhead" has racial undertones, that conclusion still requires an *inference*. None of the alleged statements can be characterized as "overtly racial."

Another aspect of *Pena-Rodriguez* confirms the narrow bandwidth of the test: the discretion the Supreme Court accords district courts when deciding whether a juror statement meets the "threshold showing" "that racial animus was a significant motivating factor on the juror's vote." 137 S. Ct. at 869. The Court stated that, "Whether that threshold showing has been satisfied is a matter committed to the *substantial discretion* of the trial court *in light of all the circumstances*, including the content and timing of the alleged statements and the reliability of the proffered evidence." *Id.* (emphases added). Here, the majority largely ignores the district court's express finding that "the lack of proof, not racial bias, is what motivated the jury's verdict." The court considered the alleged juror statements against the backdrop of a completed trial and a unanimous jury verdict in favor of the defendant. The district judge also undoubtedly observed that the plaintiff and the defendant are both African American, as is T.H. She does not allege that she was pressured to vote against Harden, and indeed she did find by a preponderance of the evidence that Harden had not demonstrated his rights were violated. This only lends further support to the district court's opinion that it was the lack of proof, not racial bias, that informed the jury's decision. The substantial delay between the end of trial and Harden's allegation of potential misconduct might also speak to the minimal role these comments played in deliberations. Clearly her discomfort with the tenor of the deliberations was not sufficiently strong for her bring it to the court's attention immediately.[1] Given the district court's thoughtful consideration of the allegations in light of all these circumstances, it is hard to conclude that it abused its "substantial discretion" in deciding not to conduct a *Remmer* hearing.

The history of Rule 606(b) also demonstrates that we should seek to apply *Pena-Rodriguez* narrowly. When promulgating the Federal Rules of Evidence, Congress initially contemplated a broader version of the no-impeachment rule that would have allowed jurors to testify to "events or conditions which might have improperly influenced the verdict, even if these took place within the jury room." *Id.* at 876 (Alito, J., dissenting) (internal quotation and citation omitted). After debate, Congress opted for the current, stricter, version of the rule. *Id.* As the Supreme Court observed in *Pena-Rodriguez*: "This version of the no-impeachment rule has

---

[1]We also wonder why Harden's attorney did not allege possible jury misconduct until over two months after the trial concluded. Perhaps on remand the district court can make explicit findings in connection with these concerns.

substantial merit. It promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts." 137 S. Ct. at 865. The Supreme Court has also rejected attempts to expand the no-impeachment rule. *See Tanner v. United States*, 483 U.S. 107, 127 (1987) (declining to include evidence that jurors had been drinking alcohol and consuming drugs during the trial); *Warger v. Shauers*, 135 S. Ct. 521, 529 (2014) (finding that 606(b) does not allow juror impeachment where the juror is alleged to have lied during voir dire). We should be very cautious in further expanding *Pena-Rodriguez* when Congress and the Supreme Court have generally demonstrated clear reluctance to lower the bar for juror-impeachment. *See Brooks*, 2021 WL 451010, at *7 (expressing concern that broad application of *Pena-Rodriguez* could mean the "purportedly rare exception would eventually swallow the rule") (internal quotation marks and citation omitted).

It bears repeating that the core concern of the no-impeachment rule is respect for the province of the jury. As Justice Alito explained in his dissent in *Pena-Rodriguez*, "[jurors] are expected to speak, debate, argue, and make decisions the way ordinary people do in their daily lives." 137 S. Ct. at 874 (Alito, J., dissenting). This includes the right to make observations about the behavior of the witnesses. *See Reagan v. United States*, 157 U.S. 301, 308 (1895) (approving of instructions that stated the jury could consider "demeanor and conduct upon the witness stand and during the trial."); *United States v. Reesor*, 10 F. App'x. 297, 305 (6th Cir. 2001) (upholding the denial of a *Remmer* hearing where the alleged bias arose from defendant's own behavior at trial). Indeed, the jurors here were explicitly instructed that they could consider "the witnesses' conduct and demeanor" when evaluating credibility. The jurors heard evidence suggestive of addiction. They learned that Harden's medical records suggested that he was potentially an alcoholic, and they heard testimony that he was discharged from the military for failing a drug test. Thus, in determining that Hillman had not made the threshold showing of racial bias during deliberations, it would not have been unreasonable for the district court to surmise that the jurors were factoring in Harden's perceived substance abuse problems, not his race.

Finally, I believe we need to be particularly vigilant in applying this court-created exception to Rule 606(b) in civil cases. Even in the criminal context, where numerous constitutional rights are in play, the Supreme Court crafted a very narrow exception. We should be equally, if not more, cautious in applying it to the civil context where the previously prevailing party through no fault of their own could be subject to the additional burdens and costs of subsequent litigation. The majority's application of the *Pena-Rodriguez* test undermines the Supreme Court's efforts to balance the venerable no-impeachment rule, which protects jurors' privacy and the finality of verdicts, with the laudable goal of eliminating racial bias from the jury system. *See id.* at 868.

For the foregoing reasons, I respectfully DISSENT.