The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
May 1, 2025

## 2025COA42

**No. 23CA0195, *Caylao-Do v. Logue* — Evidence — Competency of Juror as Witness — Inquiry into Validity of Verdict or Indictment; Juries — Batson Challenges**

In this negligence action, plaintiff sued defendant, a police officer, for damages sustained when the officer's patrol car hit the plaintiff. The jury returned a verdict in favor of the plaintiff and awarded damages that exceeded the Colorado Governmental Immunity Act (CGIA) cap.

A division of the court of appeals holds that the constitutional exception to CRE 606(b)'s no-impeachment rule does not apply to an allegation that, during deliberations, a juror expressed anti-police bias. The division also concludes that any error in a trial court's decision to sustain a party's *Batson* objection, and thereby retain the juror subject to the objection, is harmless unless the striking party can show that the juror was not fair and

impartial.  Finally, the division confirms that the CGIA's damages

cap is inclusive of costs and prejudgment interest.

COLORADO COURT OF APPEALS     **2025COA42**

Court of Appeals No. 23CA0195
City and County of Denver District Court No. 21CV33936
Honorable David H. Goldberg, Judge

Quinessa Caylao-Do,

Plaintiff-Appellee and Cross-Appellant,

v.

Officer John Logue, in his individual capacity, and City and County of Denver,

Defendants-Appellants and Cross-Appellees.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE HARRIS
Brown and Lum, JJ., concur

Announced May 1, 2025

The Wilhite Law Firm, Zachary Elsner, Denver, Colorado; Spark Justice Law LLC, Laura B. Wolf, Englewood, Colorado, for Plaintiff-Appellee and Cross-Appellant

Katie McLoughlin, Acting City Attorney, David L. Murphy, Assistant City Attorney, Denver, Colorado, for Defendants-Appellants and Cross-Appellees

¶ 1     Plaintiff, Quinessa Caylao-Do, sued the defendants, Officer John Logue and the City and County of Denver (collectively, the City), for negligence after Logue struck Caylao-Do with his police car and injured her.  The jury returned a verdict in favor of Caylao-Do.

¶ 2     On appeal, the City contends that the trial court erred by sustaining Caylao-Do's *Batson* objection to a peremptory strike, permitting purported violations of a motions in limine order, and denying its motion for a new trial based on a juror's alleged anti-police bias.  On cross-appeal, Caylao-Do argues that the court erred by applying the Colorado Governmental Immunity Act (CGIA) damages cap to costs and prejudgment interest.

¶ 3     We discern no error.  Accordingly, we affirm the judgment.

I.     Background

¶ 4     On the night of the incident, Caylao-Do, a basketball player at the University of Colorado, was celebrating her birthday in Denver. She and a friend took an Uber to another friend's home, but the Uber driver would not complete the ride because Caylao-Do, who had been drinking, did not feel well.  Caylao-Do and her friend stepped into an alley to call another Uber.

1

¶ 5　　While the women were waiting, Logue turned his police car into the alley and struck Caylao-Do from behind, knocking her to the ground.  Thinking he had hit a cardboard box, Logue reversed to dislodge the "box" and dragged Caylao-Do along the pavement under his car.

¶ 6　　Caylao-Do suffered physical and emotional injuries that prevented her from playing basketball after the incident.  She sued the City for negligence.

¶ 7　　Following a four-day trial, the jury awarded Caylao-Do $579,795.65 in damages.  The jury apportioned 90% of the fault for the incident to Logue and 10% to Caylao-Do.  However, pursuant to the CGIA, section 24-10-114(1), C.R.S. 2024, the trial court limited recoverable damages to $387,000, inclusive of costs and interest.

## II.　The City's Appeal

### A.　The Court's *Batson* Ruling

¶ 8　　The City argues that the court erred by upholding Caylao-Do's *Batson* challenge to its peremptory strike of a Black venireperson.

#### 1.　Relevant Facts

¶ 9　　At the end of voir dire, the City exercised two of its five peremptory strikes against Jurors W and H, who were, according to

the trial court, the only Black venirepersons.[1]  Caylao-Do objected to the strikes under *Batson v. Kentucky*, 476 U.S. 79 (1986).  The court overruled the objection with respect to Juror H, and her dismissal from the venire is not at issue on appeal.

¶ 10    As for Juror W, Caylao-Do's lawyer argued that there did not seem to be a basis to strike her "other than her race."  The court then asked defense counsel to provide a basis for the strike.  Counsel initially mentioned that Juror W was young[2] and studying psychology.  When Caylao-Do's lawyer noted that other jurors had training in the healthcare field, defense counsel interjected with additional reasons: Juror W was an athlete and a part-time student.  Caylao-Do's lawyer again referenced similarly situated jurors, including a non-Black juror who had played collegiate sports at a higher level than Juror W.

---

[1] The City says there was a third Black venireperson who ultimately served on the jury.  The record on appeal does not include information about the racial make-up of the venire or the jury.
[2] Juror W was twenty-nine years old.  The City did not peremptorily strike prospective jurors who were twenty-six and twenty-eight.

¶ 11     The trial court was not persuaded by defense counsel's reasons. It found that the true motive for the peremptory strike was "race based" and upheld the *Batson* challenge.

¶ 12     Following the court's ruling, defense counsel offered additional reasons for the strike: "based on a lot of things," Juror W was likely to be "sympathetic to the plaintiff"; also, she was self-employed.

¶ 13     The court did not find the additional reasons compelling. It explained that nothing about Juror W, including the proffered reasons, suggested she would be "less than fair and impartial." When defense counsel countered that the City could exercise its peremptory strikes even on fair and impartial jurors, so long as the reason for the strike was not "race based," the court responded that it believed the strike *was* based on Juror W's race.

                    2.     Legal Principles and Standard of Review

¶ 14     Racially motivated peremptory strikes violate both the objecting party's and the prospective juror's constitutional rights to equal protection. *People v. Johnson*, 2024 CO 35, ¶ 12.

¶ 15     To protect these rights, the Supreme Court has outlined a three-step process for determining whether a peremptory strike is discriminatory:

> [O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem*, 514 U.S. 765, 767 (1995).

¶ 16   The critical question at step three is whether, in light of all the evidence, the proffered reason was pretextual and the strike was actually motivated by discriminatory intent. *People v. Ojeda*, 2022 CO 7, ¶ 28; *see also Elem*, 514 U.S. at 768 (explaining that "implausible" justifications "may (and probably will) be found to be pretexts for purposeful discrimination"). To answer this question, the trial court evaluates the persuasiveness of the proponent's justification for the strike, *People v. Wilson*, 2015 CO 54M, ¶ 14, by considering, among other things, "the striking party's demeanor, the lack of questioning about the reason given," and "whether the striking party struck similarly situated jurors of a different race," *Johnson*, ¶ 49. "If the [proponent]'s asserted race-neutral reasons do not hold up, and 'the racially discriminatory hypothesis' better

fits the evidence, then the trial court must uphold the *Batson* challenge." *Wilson*, ¶ 14.

¶ 17 On appeal, each step of the *Batson* analysis is subject to a separate standard of review. *Ojeda*, ¶ 30. We review de novo the trial court's rulings at step one and step two, which involve questions of law. *Id.* But at step three, the trial court must make a factual determination as to whether the challenger has shown a discriminatory motive for the strike. Thus, we review step three rulings under the highly deferential clear error standard. *Id.*

### 3.   Discussion

¶ 18 The City asserts that the court committed two errors in its *Batson* analysis: first, it failed to make findings at each step; and second, in determining that the strike was based on Juror W's race, the court applied the heightened standard that governs challenges for cause.

¶ 19 True, before moving to step two, the court did not expressly find that Caylao-Do had met her burden at step one to make out a prima facie case of discrimination. But once the court asked defense counsel to provide a reason for the strike, the question of whether Caylao-Do had cleared step one became moot. *See Wilson,*

¶ 12.   And no one disputes that at step two, the City offered race-neutral reasons for the peremptory strike.  Thus, even without making explicit findings, the court was required to proceed to a step-three determination as to whether the City's proffered reasons were a pretext for a discriminatory or "race based" strike.  *See People v. Austin*, 2024 CO 36, ¶ 20 ("Once a race-neutral reason is given, the court should move to *Batson*'s third step.").

¶ 20   We are also unpersuaded by the City's argument that at step three, the court erroneously applied the standard for a for-cause strike.  In our view, the court's reference to Juror W's ability to be fair and impartial was simply part of its explanation for why it had rejected the City's proffered justification for the strike.  By emphasizing Juror W's impartiality, the court was relaying its skepticism about the City's reasons for concluding that Juror W would be a poor juror for the defense.  As the court confirmed a moment later, it knew that the City could peremptorily strike a juror for any reason, except one based on the juror's race or other protected characteristics.  The court was not confused about the applicable legal standard.  Rather, it found, as a factual matter, that the City's reasons for the strike were a pretext and the strike

7

was, in fact, motivated by the juror's race. We see no basis for disturbing that finding. *See People v. Beauvais*, 2017 CO 34, ¶ 25 (explaining that, because the findings at step three largely turn on credibility determinations, a reviewing court generally defers to the trial court's ultimate finding concerning discriminatory intent).

¶ 21 But regardless, to obtain a reversal, the City would have to establish prejudice, and it has not endeavored to do so. A trial court's erroneous ruling upholding a *Batson* challenge, even if it results in the denial of a peremptory challenge, does not require reversal of the judgment. *See Rivera v. Illinois*, 556 U.S. 148, 157-58 (2009); *see also Laura A. Newman, LLC v. Roberts*, 2016 CO 9, ¶¶ 3, 23, 26 (If a court errs by restricting a party's peremptory challenges, the appealing party must show that the error "substantially influenced the outcome of the case.").

¶ 22 The City has not alleged, much less shown, that Juror W was biased or otherwise incompetent to serve on the jury. Consequently, the "trial judge's refusal to excuse [Juror W] did not deprive [the City] of [its] constitutional right to a fair trial before an impartial jury." *Rivera*, 556 U.S. at 158; *see also People in Interest of R.J.*, 2019 COA 109, ¶ 29 (The court's error in exercising

peremptory challenges on one party's behalf was harmless because a party does not have a right "to a particular mix of impartial jurors.").

### B.     Violations of Motions in Limine Order

¶ 23     Next, the City says that reversal is warranted because Caylao-Do's counsel violated the court's in limine order.

### 1.     Relevant Facts

¶ 24     Before trial, the City filed motions in limine to preclude evidence of Caylao-Do's lost future professional basketball wages and of unrelated police violence and racial justice protests.

¶ 25     Regarding lost future wages, the City argued that the evidence was inadmissible, primarily because it was the subject of expert testimony and Caylao-Do's coach was not an expert and had not been endorsed as one.  Regarding the unrelated police violence and protests, the City argued that "[Caylao-Do's] counsel [might] attempt to enflame the jury with irrelevant rhetoric regarding the race of the parties, police violence, and ongoing movements for social and political justice."  It asked the court to exclude "any questioning, argument, or suggestions of race-based motivations or

bias, incidents of police violence, or racial-justice movements or protests." The court granted both motions in limine.

¶ 26 During closing argument, Caylao-Do's counsel told the jury that her discussion of damages would focus on "the loss of a career and what that means." She immediately clarified that "[w]e're not asking you to guess what [Caylao-Do] could have earned as a pro basketball player," but instead to consider "the value of [her] lost dream." Counsel described the commitment and sacrifices necessary to play high-level youth and college basketball and compared that endeavor "to a full-time job." She told the jury that "one way to think about" damages was to "estimate the value of each year, substituting a reasonable salary," for the time period that Caylao-Do *did* play basketball — to compensate her for her past efforts that would no longer lead to a professional career.

¶ 27 Later, during rebuttal closing, counsel said, "According to [the City], if you have any blood alcohol level whatsoever, you have the right to be run over by a police officer on duty. He has no obligation to use his lights or due care or look around him."

¶ 28    Defense counsel did not contemporaneously object to any of these statements.  On appeal, the City contends that counsel's comments violated the trial court's in limine order.

## 2.    Discussion

¶ 29    We agree with Caylao-Do that the City failed to preserve this issue for appeal.

¶ 30    A motion in limine preserves a claim that the trial court erroneously admitted evidence the appellant sought to exclude.  *See Bernache v. Brown*, 2020 COA 106, ¶¶ 4, 12.  But it does not preserve a claim that the other party violated an in limine order excluding evidence the party had sought to admit.  *See People v. Dinapoli*, 2015 COA 9, ¶¶ 19-24.  In the former circumstance, a contemporaneous objection when the expected evidence is introduced amounts to a useless formality.  *Id.* at ¶ 21.  But in the latter circumstance, "an objection does not merely revive an argument that the court has already rejected."  *Id.* at ¶ 22.  Rather, the objection allows the court to determine, at the relevant time, whether the admission of evidence or argument by counsel actually violates the pretrial order.  *See id.*; *State Farm Mut. Auto. Ins. Co. v. Goddard*, 2021 COA 15, ¶¶ 84-85.

¶ 31     An objection was particularly important here because it is not readily apparent that counsel's comments fall within the order's prohibition.  Counsel did not present lay opinion testimony in the guise of expert testimony, nor did she argue that the jury should award damages for lost future wages.  And the connection between an officer's responsibility for a collision involving an inebriated pedestrian and police violence or social justice protests is even more tenuous.  If the City thought that counsel's comments were precluded by the court's order, it had to "alert the trial court" and present its "argument against the other party's action."  *Dinapoli*, ¶ 22.  It could not sit silently while the order was supposedly violated and then move for a new trial based on the error.  *Id.*

¶ 32     For these reasons, we conclude that the issue is not preserved.  In a civil case, unpreserved issues are deemed waived.  *O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1282 (Colo. App. 2010).

¶ 33     We decline the City's request, raised in its reply brief, to apply plain error review to its unpreserved claim.  For one thing, we do not consider arguments raised for the first time in a reply brief.  *See Gomez v. Walker*, 2023 COA 79, ¶ 9 n.3.  And in any event, plain error review in civil cases applies only in unusual or special

12

circumstances and, even then, "only 'when necessary to avert unequivocal and manifest injustice.'" *Scholle v. Ehrichs*, 2022 COA 87M, ¶ 86 (quoting *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1269 (Colo. App. 2010)), *aff'd in part and rev'd in part*, 2024 CO 22. There are no such circumstances here.

C.    The City's Motion for a New Trial Based on Juror Misconduct

¶ 34    Lastly, the City argues that the trial court erred by denying its motion for a new trial based on allegations that a juror was biased against the police.

1.    Relevant Facts

¶ 35    After the jury returned its verdict, the City moved for a new trial, alleging that a juror had reported that Juror S expressed "anti-police bias" during deliberations. The motion included an affidavit from the accusing juror, who asserted the following:

- While watching body camera footage, Juror S "commented on how 'the blue line protects their own' in response to the police officers seemingly not asking Ms. Caylao-Do about her condition."

- Juror S said several times that the City and the police "always fuck up" and that "they're trying to 'cover their ass.'"

13

- Juror S told the other jurors that it was their "job as a jury to 'help [Caylao-Do].'"

- When asked "what justice looked like from his perspective," Juror S said something like, "getting the City of Denver to 'cough up.'"

- Juror S was "the loudest voice in the room and resort[ed] to insults and cursing."

- Juror S thought the officer was 100% at fault, but he eventually agreed to apportion 10% of the fault to Caylao-Do. Initially, Juror S "felt the $1.7 million" requested by Caylao-Do was fair, but he ultimately agreed to "meet in the middle" on damages "because he needed to get back to work."

¶ 36    The court denied the motion for a new trial, concluding that the accusing juror's affidavit was inadmissible under CRE 606(b) to impeach the verdict. In reaching that conclusion, the court rejected the City's argument that the affidavit's allegations fell within the judicially crafted "constitutional" exception to the rule.

2.    Legal Principles and Standard of Review

¶ 37    Courts have long enforced a "no-impeachment" rule, which generally prohibits using juror testimony to contest a verdict. *See*

14

*Warger v. Shauers*, 574 U.S. 40, 45-47 (2014). The no-impeachment rule is now codified in CRE 606(b) and its substantially similar federal counterpart, Fed. R. Evid. 606(b). *See Stewart v. Rice*, 47 P.3d 316, 321 (Colo. 2002).

¶ 38    Under CRE 606(b), on a challenge to the verdict, a juror may not testify "as to any matter or statement occurring during the course of the jury's deliberations" or reveal anything about the jurors' "mental processes in connection" with their decision to "assent to or dissent from the verdict." And a juror's affidavit is inadmissible if it pertains to any "matter about which the juror would be precluded from testifying." CRE 606(b).

¶ 39    The rule has three exceptions, however: a juror may testify about (1) extraneous prejudicial information improperly brought to the jurors' attention; (2) any outside influence that was improperly brought to bear on a juror; and (3) any mistake in entering the verdict on the verdict form. *Id.*

¶ 40    The Supreme Court has also recognized a narrow constitutional exception. In *Warger*, the Court rejected an argument that Fed. R. Evid. 606(b) permitted the use of a juror's post-verdict testimony to establish that another juror lied during

15

voir dire. 574 U.S. at 42. But it acknowledged that a constitutional exception to the rule might be required for "cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." *Id.* at 51 n.3.

¶ 41 Three years later, the Court was presented with such a case. In *Peña-Rodriguez v. Colorado*, two jurors submitted affidavits detailing another juror's explicit racist statements directed at the Hispanic defendant. 580 U.S. 206, 212-13 (2017). The Court held that the no-impeachment rule must yield when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Id.* at 225.

¶ 42 Even with these exceptions, the no-impeachment rule retains its broad prohibition on the use of juror testimony to challenge a verdict. *See People v. Burke*, 2018 COA 166, ¶ 10 (explaining that CRE 606(b) prohibits juror testimony to impeach a verdict even on grounds including "mistake, misunderstanding of the law or facts, failure to follow instructions, lack of unanimity, or application of the wrong legal standard") (citation omitted). And for good reason. The rule protects jurors from harassment and coercion, thereby encouraging full and vigorous deliberations, and "gives stability and

finality to verdicts." *Peña-Rodriguez*, 580 U.S. at 218. "Thus, absent a recognized exception, juror testimony (through an affidavit or otherwise) is inadmissible to impeach a verdict." *People v. Archuleta*, 2021 COA 49, ¶ 20.

¶ 43　While we leave the decision whether to grant or deny a motion for a new trial to the trial court's discretion, *id.* at ¶ 13, we review de novo the court's interpretation of a rule of evidence, *Gonzales v. People*, 2020 CO 71, ¶ 26.

### 3.　Discussion

¶ 44　The City says that Juror S's "extreme" anti-police bias fits within the constitutional exception to CRE 606(b), and, therefore, the court erred by denying the motion for a new trial without considering the accusing juror's affidavit.

¶ 45　As an initial matter, we will assume, without deciding, that Juror S's comments, or at least some of them, demonstrate an actual bias against police officers. And we will assume, again without deciding, that *Peña-Rodriguez*'s constitutional exception applies in civil cases. *See Harden v. Hillman*, 993 F.3d 465, 481 (6th Cir. 2021).

¶ 46　　But the *Peña-Rodriguez* Court made quite clear that the constitutional exception to the no-impeachment rule applies only to instances where racial animus substantially motivated a juror's finding of guilt.  580 U.S. at 211.  A narrow carve-out for racial bias was necessary, the Court explained, because racial bias is different than other kinds of juror biases.  *Id.* at 223-24.  Racial bias causes "systemic injury to the administration of justice" by undermining "the promise of equal treatment under the law," and it is particularly difficult to root out because traditional safeguards are not effective at disclosing that kind of bias.  *Id.* at 224-25.

¶ 47　　The City does not direct us to, and we have not found, a single case in any jurisdiction that extends the constitutional exception beyond its original application to racial bias.  In *Burke*, the only Colorado case to have considered the exception's scope, the division concluded that *Peña-Rodriguez* did not "support the recognition of a separate constitutional exception to CRE 606(b)" for juror bias based on a defendant's failure to testify at trial.  *Burke*, ¶¶ 29-30.

¶ 48　　Nonetheless, the City relies on *Burke*, arguing that the division's reasoning supports an extension of the constitutional exception to anti-police bias.  In reaching its conclusion, the *Burke*

division explained that its case lay "on the other side of the divide from *Pena-Rodriguez*" because the case "[did] not involve juror bias that relates to any characteristic personal to the defendant, and because it involve[d] anomalous behavior from a single juror." *Id.* at ¶ 27.

¶ 49 According to the City, those distinctions prove its point; here, the juror's anti-police bias did relate to "a personal characteristic of the defendant — that [he] is a police officer," and anti-police bias is widespread, or at least was at the time of trial. We see a couple of problems with the City's argument.

¶ 50 First, by "characteristic personal to the defendant," the *Burke* division did not mean the defendant's job. That is obvious from the context, given that the division was distinguishing between its case and *Peña-Rodriguez,* which involved bias based on the defendant's immutable or innate personal characteristic — race. "[A] person's job is generally not an immutable or fundamental characteristic." *Montes De Oca-Bolanos v. Whitaker,* 748 F. App'x 140, 141 (9th Cir. 2019); *Ospina Hernandez v. U.S. Att'y Gen.,* 404 F. App'x 387, 390 (11th Cir. 2010) ("Because Petitioner could change jobs, his position

as a sports coach is not an immutable characteristic that is fundamental to his identity.").

¶ 51    Second, this case, like *Burke*, involves "anomalous behavior from a single juror." *Burke*, ¶ 27. Unlike racial bias, which the Supreme Court characterized as a "familiar and recurring evil" that implicates unique institutional concerns, "neither history nor common experience shows that the jury system is rife with" anti-police bias. *Peña-Rodriguez*, 580 U.S. at 224. If there is any evidence to support the City's bald assertion that "virulent" bias against the police systemically infects the jury process, it was not presented to the trial court or to this division.[3]

¶ 52    Pointing out that, in this particular case, some members of the venire had negative experiences with or expressed concerns about the police does not advance the City's position. By the City's own

---

[3] The only authority the City cites to support its position is *Stealth Juror: The Ultimate Defense Against Bad Laws and Government Tyranny*, a 2002 book written by Trent Hammerstein and published by the now-defunct Paladin Press, whose website advertised books on subjects like "Knives and Knife Fighting" and "Espionage and Investigation." *See* Paladin Press, *Legal Statement*, https://perma.cc/GR5X-PQ2Z. But even accepting the book as a legitimate source of information, the City's description of it does not suggest that so-called "stealth jurors" are biased against the police.

admission, the traditional safeguard of voir dire disclosed the jurors who had those concerns, and they were either rehabilitated or excused from jury service. *See id.* at 224-25 (explaining that while traditional safeguards like voir dire tend to root out most juror biases, they are not as effective at uncovering racial bias). And in the case of Juror S, another juror felt free to raise the alleged bias, albeit post-trial. *Id.* at 225 (explaining that while jurors are likely to raise most juror misconduct issues with the court, they are unlikely to accuse a fellow juror of racial bias).

¶ 53      Nor can the City gain any mileage from *Archuleta*. The *Archuleta* division considered whether CRE 606(b) applied to juror misconduct that occurs before deliberations begin. *Archuleta*, ¶ 21. Contrary to the City's reading, the division did not hold that "the severity of the bias" controls whether the no-impeachment rule applies; rather, the division held that it is the "nature of the misconduct alleged" (i.e., whether the misconduct was "based on external or internal influences"), and "not when it occurred[,] that matters." *Id.* at ¶¶ 25-26. And here, the City does not dispute that Juror S's alleged anti-police comments "fall[] on the 'internal' side of the line." *Id.* at ¶ 25 (quoting *Warger*, 574 U.S. at 51).

¶ 54     Then there is the fact that the only courts to have addressed this question have rejected the argument that allegations of pro- or anti-police bias fall within the constitutional exception to the no-impeachment rule.  *See United States v. Brown,* 934 F.3d 1278, 1293, 1302-03 (11th Cir. 2019) (Testimony that some jurors "harbored bias against police officers" and relied on their "misconceptions about police" to reach a verdict was inadmissible because, "outside of racial bias, [Fed. R. Evid.] 606(b) prohibits inquiries into alleged . . . prejudices of the jury."); *Bryant v. Mascara,* No. 2:16-CV-14072, 2018 WL 3868709, at *6 (S.D. Fla. Aug. 14, 2018) (unpublished order) ("Allegations of bias in favor of police officers do not meet the narrow exception to the no impeachment rule . . . for allegations of racial bias.").

¶ 55     Under the City's interpretation of CRE 606(b), the constitutional exception would swallow the rule.  Any allegation of an occupation-based bias could override the no-impeachment rule, subjecting juries to the "unrelenting scrutiny" that the *Peña-Rodriguez* court sought to avoid by crafting a narrow exception for racial bias.  580 U.S. at 224.

¶ 56    Accordingly, we hold that the constitutional exception to CRE 606(b) does not apply to allegations of anti-police bias.  The trial court, therefore, did not err by denying the City's motion for a new trial.[4]

## III.    Caylao-Do's Cross-Appeal

¶ 57    On cross-appeal, Caylao-Do argues that the trial court erred by concluding that the CGIA damages cap applies to costs and prejudgment interest.

### A.    Relevant Facts

¶ 58    As noted, the jury awarded Caylao-Do $579,795.65 (reduced to $521,816.09 based on a finding that she was 10% at fault).  The parties agreed that the CGIA limitation on damages allowed for a maximum award of $387,000.[5]  The issue in dispute is whether the damages cap was inclusive of costs and prejudgment interest.  The

---

[4] To the extent the City provides additional reasons that the motion for a new trial should have been granted, we do not consider those, as they were not raised in its motion for a new trial.  *See Al-Hamim v. Star Hearthstone, LLC*, 2024 COA 128, ¶ 24 (explaining that in civil cases, issues not raised in or decided by the trial court will not be addressed for the first time on appeal).

[5] The Secretary of State adjusts the CGIA damages cap every four years.  *See* Colorado Secretary of State, Certificate (Jan. 5, 2022), https://perma.cc/4FAP-YS2X.

trial court determined that it was and entered judgment in favor of Caylao-Do in the amount of $387,000.

## B.    Discussion

¶ 59    Subject to various exceptions not relevant here, the CGIA limits damages recoverable from a public entity or public employee as follows: "For any injury to one person in any single occurrence," the "maximum amount . . . shall be . . . the sum of three hundred fifty thousand dollars" (as adjusted).  § 24-10-114(1)(a).

¶ 60    Caylao-Do contends that we should read section 24-10-114(1)(a)(I) to exclude costs and interest from the damages cap.  But in interpreting this provision of the CGIA, we are hardly writing on a blank slate.  The supreme court has essentially settled this question, as Caylao-Do acknowledges.

¶ 61    In *Lee v. Colorado Department of Health*, the supreme court construed an earlier version of section 24-10-114(1) to mean that "the total amount of the judgment, inclusive of interest and costs, must not exceed the recovery limitations imposed by" the damages cap — then $150,000 for an injury to one person in a single occurrence.  718 P.2d 221, 229 (Colo. 1986).  The version of the statute then in effect was identical in all relevant respects to the

current provision, except that it included an exception when a public entity opted to carry insurance in an amount in excess of the statutory cap. *See* § 24-10-114(2)(a), C.R.S. 1985. Under those circumstances, the court said, an injured party was entitled to recover damages up to the limit of the entity's insurance policy. *Lee*, 718 P.2d at 229. Because the trial court had not considered the extent of the entity's insurance coverage, the supreme court remanded the case for a determination of whether the exception applied. *Id.*

¶ 62    A month after the *Lee* decision was issued, the legislature amended section 24-10-114 to delete subsection (2)(a)'s insurance coverage exception to the statutory cap. Ch 166, sec. 12, § 24-10-114(2), 1986 Colo. Sess. Laws 879. But it left undisturbed subsection (1)(a), which, according to *Lee*, creates a damages cap inclusive of costs and interests. *See Far Horizons Farm, LLC v. Flying Dutchman Condo. Ass'n*, 2023 COA 99, ¶ 22 ("[W]e presume that the General Assembly was aware of existing case law construing a statute when it amended the statute.").

¶ 63    Caylao-Do concedes that the supreme court has determined "that costs and interest *are* subject to the CGIA's limitation on

25

damages."  She says, though, that *Lee* was either wrongly decided or has been "vitiated by subsequent developments."

¶ 64    First, whatever we may think of Caylao-Do's critiques of *Lee*, the decision is binding on us, as are all supreme court decisions. *Gebert v. Sears, Roebuck & Co.*, 2023 COA 107, ¶ 47.  So we may not disregard the court's interpretation of the statutory language or reassess the persuasiveness of its policy considerations.

¶ 65    Second, no subsequent developments cast doubt on *Lee*'s holding.  Caylao-Do notes that the version of the statute the *Lee* court interpreted has been amended.  True, but as we have explained, not the subsection that applies here.  And she says that at the time *Lee* was decided, a later-repealed chief justice directive generally precluded courts from assessing costs against a public entity.  That might be true, too, but *Lee* specifically held that "a public entity which has been sued pursuant to [the CGIA] may be taxed costs" and assessed "interest" "in connection with the judgment entered against it."  718 P.2d at 229.  Thus, the repealed chief justice directive is not relevant.

¶ 66    For these reasons, we conclude that the trial court properly applied the statutory cap to limit damages to $387,000, including costs and prejudgment interest.

## IV.   Disposition

¶ 67    The judgment is affirmed.

JUDGE BROWN and JUDGE LUM concur.