23CA1048 Peo v Russell 10-16-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1048
Las Animas County District Court No. 21CR192
Honorable Pierce L. Fowler, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cynthia Russell,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE BROWN
Fox and Meirink, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 16, 2025

Philip J. Weiser, Attorney General, Emmy A. Langley, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Rachel Z. Geiman, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Cynthia Russell, appeals the judgment of conviction entered on a jury verdict finding her guilty of felony menacing and harassment.  Russell contends that (1) the district court erred by admitting certain statements contained in a video exhibit; (2) the prosecutor committed misconduct throughout trial; and (3) the court's reasonable doubt instruction unconstitutionally lowered and shifted the burden of proof.  Russell also contends that these alleged errors cumulatively deprived her of a fair trial.  We affirm.

## I.    Background

¶ 2     Alisha Keyes and her boyfriend live at the end of a long dirt road on property neighboring that of Russell and her husband, Floyd Russell.[1]  The road leading to Keyes' property partially runs through land owned by Russell, but a recorded easement grants the residents living along the road rights to, among other things, use it for "ingress and egress."

¶ 3     One evening in September 2021, Keyes and her boyfriend were planning to sell a car to Nathan Thompson, a Northglenn police

---

[1] Because Cynthia Russell and Floyd Russell share a last name, we refer to Floyd by his first name.  We mean no disrespect in doing so.

officer. In preparation for the sale, Keyes rolled the car down her driveway and positioned it just outside the gate that connects her driveway to the road. Thompson, his brother, and another friend arrived at approximately 10:00 p.m. Thompson's brother drove the group in a large truck towing a flatbed trailer. Thompson's brother parked the truck in front of Keyes' gate, and Thompson met Keyes' boyfriend to examine the car. Satisfied with the condition of the vehicle, Thompson and his brother tried to turn the truck around so they could load the car onto the trailer, but the trailer "jackknifed" and became stuck across the road.

¶ 4     Around the same time, Floyd emerged from the darkness carrying a handgun and shouting for the group to get "off [his] property." Thompson explained that he was an off-duty police officer there to buy a car and that nothing suspicious was happening. Shortly after Thompson calmed Floyd down, Russell appeared waving a gun and demanding that Thompson and his brother put their hands up. Thompson showed Russell his badge and explained that he was there to purchase a car, but Russell continued to wave her gun and insist that Thompson could not do anything because he was outside of his jurisdiction.

2

¶ 5    Meanwhile, Keyes walked down to the gate to investigate because she heard "screaming and hollering."  Keyes explained to Russell and Floyd that she was just selling a car and told them to "put [their] guns away."  Russell responded by waving her gun, pointing it at Keyes, and saying she would shoot Keyes "in her fucking face."  Russell continued shouting things like, "I'm a good shot," "I will fucking kill her," "I can get her from here," and "I'm going to shoot this fucking bitch," all while waving her gun around.  Russell also said that "if she knew the vehicle was there, she would have went out there and shot the vehicle up."

¶ 6    After some time, Thompson was able to de-escalate the situation, buy the car, load it onto the trailer, and drive away down the road.  Once Thompson returned to an area with cell service, he called 911 to report what had happened.

¶ 7    The prosecution charged Russell with felony menacing and harassment, and a jury convicted her as charged.  The district court sentenced her to two years of supervised probation and twenty-four hours of useful public service.

## II.     Evidentiary Contentions

¶ 8     Russell contends that the district court erred by admitting a video recording that contained (1) Thompson's opinions on Russell's guilt and (2) CRE 404(b) evidence.  We discern no basis to reverse.

### A.     Standard of Review

¶ 9     We review a trial court's evidentiary rulings for an abuse of discretion.  *People v. Hard*, 2014 COA 132, ¶ 22.  A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law.  *People v. Sims*, 2019 COA 66, ¶ 44.

¶ 10     If a defendant objected to the admission of evidence at trial, we review any error under the harmless error standard.  *Hard*, ¶ 23.  But if a defendant failed to object, we review for plain error.  *Hagos v. People*, 2012 CO 63, ¶ 14.  Plain error is error that is both obvious and substantial, such that it so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.  *Id.*

### B.     Additional Background

¶ 11     Russell filed a pretrial motion in limine to exclude CRE 404(b) evidence of her prior aggressive conduct, including evidence relating

to an "incident between [Keyes] and [Russell] about a year prior" that involved roofers. At a motions hearing, the prosecutor indicated that he had no intention of bringing the incident up but reserved the right to discuss it should it become relevant at trial. The court ruled that "anything that could go to [Russell's] state of mind on the night of [the altercation] will be considered appropriate as it may be used in an affirmative defense," but that it did not want to hear "a witness stating that [Russell] used or engaged in a use of force previously as a . . . previous act or wrong."

¶ 12     During Keyes' direct examination, the prosecutor moved to admit Exhibit 4, a cell phone recording that Keyes took of a conversation she had with Thompson immediately following the altercation. Defense counsel objected to the exhibit as irrelevant and because it contained hearsay and "improper legal conclusions."[2] The court overruled Russell's objections as to relevance and hearsay but deferred ruling on the objection to

---

[2] Although Russell argued at trial that the recording was irrelevant and contained inadmissible hearsay, she does not reassert those arguments on appeal. Thus, we deem those arguments abandoned. *See People v. Brooks*, 250 P.3d 771, 772 (Colo. App. 2010).

improper legal conclusions, instructing counsel, "[Y]ou can object if we start to hear anything that would require legal conclusions."

¶ 13    The court admitted Exhibit 4 into evidence.  The video is mostly black due to the dark conditions at the time it was recorded, but the audio includes the following:

- After Thompson asked Keyes if she wanted to press charges, Keyes asked Thompson what he "would recommend living so close to" Russell.  Thompson replied, "I just had a gun pointed at me, I think that's one fucking thousand percent uncalled for considering that we are backing a car up and there's no actual threat here, so one hundred percent she just committed a felony."

- Keyes stated that Russell is "horribly violent" and recounted an instance where "roofers got stuck in the winter and [Russell] threatened to hurt them, too."

¶ 14    Before Exhibit 4 was played at trial, the prosecutor asked the court to instruct the jury to disregard any legal conclusions contained in the recording.  The court instructed the jurors that they were "the final arbiters of the decisions of law and fact in this case" and that they should not "put greater weight onto what Officer

Thompson may or may not say [i]n this video." Defense counsel renewed his hearsay objection "to Officer Thompson's statements," but the court overruled the objection.

¶ 15 The trial transcript reflects that at least a portion of Exhibit 4 was then played for the jury, but we do not know what part. We do know that the prosecutor asked someone to "rewind it all the way" and then played sixty-nine seconds of the recording. The only challenged evidence that can be heard in the first sixty-nine seconds is Keyes' statement that Russell is "horribly violent." Thompson's statements and Keyes' statement about Russell threatening the roofers are more than two minutes into the recording. Defense counsel did not object to any statements as the exhibit was played at trial, nor after.

C. Russell's Evidentiary Contentions Are Unpreserved

¶ 16 We have "an independent, affirmative duty to determine whether a claim is preserved and what standard of review should apply, regardless of the positions taken by the parties." *People v. Tallent*, 2021 CO 68, ¶ 11. Based on our review of the record, we conclude that Russell failed to preserve her contentions that the

district court erred by admitting Thompson's "legal conclusions" or any CRE 404(b) evidence contained in Exhibit 4.

¶ 17    To preserve an issue for appeal, the defendant must raise the issue and provide the district court with "an adequate opportunity to make findings of fact and conclusions of law." *People v. Melendez,* 102 P.3d 315, 322 (Colo. 2004); *see* CRE 103(a)(1). And "it is incumbent on the moving party to see to it that the court rules on the matter [s]he urges." *Feldstein v. People*, 410 P.2d 188, 191 (Colo. 1966), *abrogated on other grounds by*, *Deeds v. People*, 747 P.2d 1266, 1269-72 (Colo. 1987). A timely, specific objection "allows the trial court a meaningful chance to prevent or correct the error and creates a record for appellate review." *Martinez v. People*, 2015 CO 16, ¶ 14.

¶ 18    With respect to the potential "legal conclusions" contained in Exhibit 4, the district court expressly reserved its ruling and instructed defense counsel to object when the video was played for the jury. Because the court did not make a definitive ruling when counsel first raised the issue, counsel had to object again if any of Thompson's statements amounted to improper legal conclusions. *See Feldstein,* 410 P.2d at 191; *cf. People v. Dinapoli,* 2015 COA 9,

¶ 20 ("A pretrial motion may preserve an evidentiary objection for appellate review if the moving party fairly presents the issue to the court *and the court issues a definitive ruling.*" (emphasis added)); CRE 103(a) ("*Once the court makes a definitive ruling* on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." (emphasis added)). But counsel did not contemporaneously object to any statement in Exhibit 4 on the ground that it amounted to an improper legal conclusion. Absent such an objection, the court was deprived of a meaningful opportunity to correct the error. *See Martinez,* ¶ 14.

¶ 19 With respect to the CRE 404(b) evidence, although the court partially granted Russell's pretrial motion to exclude that evidence, "when a party violates the court's pretrial order at trial, the opposing party must contemporaneously object to preserve the issue for appeal." *Dinapoli,* ¶ 19; *see People v. Richardson,* 2019 COA 120, ¶ 64. Such an objection "allows the court to determine, at the relevant time, whether the admission of evidence . . . actually violates the pretrial order." *Caylao-Do v. Logue,* 2025 COA 42, ¶ 30. Defense counsel did not contemporaneously object to any statement

9

in Exhibit 4 on the grounds that it was inadmissible under CRE 404(b) or violated the court's pretrial ruling. Absent such an objection, the court was deprived of an opportunity to determine in real time whether admission of the statements violated its pretrial order or CRE 404(b). *See Caylao-Do*, ¶ 30.

¶ 20 We conclude that Russell failed to preserve her evidentiary contentions. As a result, we review them only for plain error. *Hagos*, ¶ 14.

### D. The District Court Did Not Plainly Err by Admitting the Challenged Statements

¶ 21 Russell argues that Thompson's statements — namely, that Russell's conduct was "one . . . thousand percent uncalled for" and that she "one hundred percent . . . just committed a felony" — were inadmissible because they amounted to an improper opinion on whether a legal standard had been met in the case. *See People v. Beilke*, 232 P.3d 146, 152 (Colo. App. 2009) ("[A] witness may not testify that a particular legal standard has or has not been met."). She further argues that Keyes' statements that Russell was "horribly violent" and previously threatened roofers were inadmissible under CRE 404(b) and precluded by the court's

pretrial ruling. *See* CRE 404(b)(1) ("Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character.").

¶ 22    Even assuming that the court erred by admitting the challenged statements when it admitted Exhibit 4, we conclude that any error was not plain because it did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *Hagos*, ¶ 14. We reach this conclusion for three reasons.

¶ 23    First, we are unable to determine whether the jury even heard the challenged statements. As noted, the record does not establish, and neither party is able to clarify, what part of Exhibit 4 was played during trial. If the first sixty-nine seconds of the video were played, which is the most likely inference drawn from the trial transcript, the jury heard only Keyes' statement that Russell is "horribly violent" — which Keyes said after Russell had just pointed a gun at her and repeatedly threatened to shoot her in the face.

¶ 24    In addition, despite the court's earlier rulings (1) instructing defense counsel to contemporaneously object to any improper legal

11

conclusions and (2) precluding CRE 404(b) evidence, counsel did not object while the exhibit was played at trial or after. The lack of any objection suggests that the portions of the video containing Thompson's opinions on Russell's guilt or Keyes' reference to the incident involving roofers were not played in open court. And although the district court admitted Exhibit 4 in its entirety, nothing in the record indicates that the jury asked to view the exhibit during deliberations or had the exhibit and the necessary technology required to play it in the jury room. We cannot conclude that the admission of the challenged evidence undermined the fundamental fairness of Russell's trial without knowing whether the jury was even exposed to it.

¶ 25 Second, the district court contemporaneously instructed the jury not to give greater weight to any statements Thompson made in the video and instructed the jury in its final written instructions to disregard any conclusions of law it may have heard from witnesses at trial. Absent evidence to the contrary, we presume that the jury understood and followed the court's instructions. *People v. Chase*, 2013 COA 27, ¶ 37.

¶ 26     Third, the prosecution presented overwhelming evidence that Russell committed felony menacing and harassment. *See People v. Munoz-Casteneda*, 2012 COA 109, ¶ 39 (unpreserved evidentiary errors will not be reversed under the plain error standard if the jury was presented with overwhelming evidence of the defendant's guilt). As relevant here, "[a] person commits the crime of [felony] menacing if, by any threat or physical action, he or she knowingly places or attempts to place another person in fear of imminent serious bodily injury . . . by the use of a deadly weapon." § 18-3-206, C.R.S. 2021.[3] "A person commits harassment if, with intent to harass, annoy, or alarm another person, the person . . . [r]epeatedly insults, taunts, challenges, or makes communications in offensively coarse language to another in a manner likely to provoke a violent or disorderly response . . . ." § 18-9-111(1)(h), C.R.S. 2025. The evidence at trial established that Keyes, Thompson, and the others involved in the car sale were on an access road when Russell emerged from her property, pointed a gun at Keyes, and threatened to shoot her.

---

[3] We cite the 2021 version of the menacing statute because it was in effect when the altercation occurred and has since been amended.

13

¶ 27    True, Russell asserted the affirmative defenses of (1) defense of a person, § 18-1-704, C.R.S. 2025; (2) defense of premises, § 18-1-705, C.R.S. 2025; and (3) defense of property, § 18-1-706, C.R.S. 2025.  But for her conduct to be legally justified, Russell must have reasonably believed that her use of force was necessary to prevent Keyes from (1) using unlawful physical force on Russell or Floyd, § 18-1-704(1); (2) unlawfully trespassing, § 18-1-705; or (3) committing theft, criminal mischief, or tampering with Russell's property, § 18-1-706.  Even if Russell initially believed she needed to defend herself or her property, the evidence established that after Thompson identified himself as an off-duty police officer and explained his presence on the access road, Russell continued to erratically wave her handgun and hurl threats at Keyes.

¶ 28    On this record, we conclude that any error by the district court in admitting Thompson's statements that Russell's behavior was "uncalled for" and "a felony" or Keyes' statements that Russell was "horribly violent" and had previously threatened roofers did not result in the level of prejudice required to reverse under the plain error standard.  *Hagos*, ¶ 14.

14

### III.   Prosecutorial Misconduct

¶ 29   Russell contends that the prosecutor committed misconduct by (1) misstating the evidence; (2) asking a question that elicited an inadmissible legal opinion; and (3) repeatedly discussing the access easement, which misled the jury and confused the issues at trial. We perceive no error.

### A.   Applicable Law and Standard of Review

¶ 30   We engage in a two-step analysis when reviewing claims of prosecutorial misconduct. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* We will not disturb a trial court's rulings on alleged instances of misconduct absent "a showing of gross abuse of discretion resulting in prejudice and a denial of justice." *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010). Second, if the conduct was improper, we decide whether it warrants reversal under the proper standard of review. *Wend*, 235 P.3d at 1096.

¶ 31   While prosecutors can use every legitimate means to bring about a just conviction, they have a duty to avoid using improper methods intended to obtain an unjust result. *Domingo-Gomez v.*

15

*People*, 125 P.3d 1043, 1048 (Colo. 2005). When determining whether a prosecutor's statements were improper and whether reversal is warranted, we may consider the language used, the context of the statements, the strength of the evidence, whether the prosecutor improperly appealed to the jurors' sentiments, whether the misconduct was repeated, and any other relevant factors. *People v. Walters*, 148 P.3d 331, 335 (Colo. App. 2006).

### B. The Prosecutor's Misstatement During Closing Argument Does Not Amount to Misconduct

¶ 32    At trial, Floyd testified that Thompson's brother was "in front of the truck peeing, whenever [Russell] came up" and disrupted Thompson's purchase of Keyes' car. During closing argument, the prosecutor stated that "when [Russell] came down with her pistol[,] . . . Thompson's brother went over to pee, because that's what we do in our common experience in life when two armed people come from the darkness." Russell's counsel objected to the prosecutor's argument as a misstatement of the evidence, but the district court overruled his objection.

¶ 33    Russell argues that the prosecutor misstated Floyd's testimony to discredit him by making his story sound ridiculous. She also

16

argues that "Floyd's testimony was the only evidence the jury had to support the defense's theory that [Russell] acted in defense of Floyd and her property," so the misconduct likely contributed to Russell's conviction. We are not persuaded.

¶ 34    To be sure, a prosecutor may not misstate the evidence. *People v. Payne*, 2019 COA 167, ¶ 46; *see Domingo-Gomez*, 125 P.3d at 1049 ("The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw."). And the prosecutor's argument here could be seen as a slight misstatement as to *when* Floyd said Thompson's brother purportedly urinated — Floyd's testimony suggested it happened shortly before Russell approached while the prosecutor's statement suggested it happened shortly after Russell approached. But the thrust of the prosecutor's argument was that Floyd's testimony was not credible because no one would feel comfortable urinating in the middle of a stressful conflict where guns had been drawn — regardless of the timing. In context, the prosecutor's argument appears to be an inartful attempt to discredit a defense witness rather than an intentional misstatement intended to mislead the jury. *See Domingo-Gomez*, 125 P.3d at 1049.

¶ 35    Moreover, the prosecutor's statement related to an ancillary issue; when Thompson's brother may have urinated implicates none of the elements of the charged offenses or asserted affirmative defenses. *See* §§ 18-1-704, 18-1-705, 18-1-706, 18-3-206(1)(a)-(b), 18-9-111(1)(h). Thus, we conclude that the court did not grossly abuse its discretion by determining that the prosecutor's slight misstatement did not amount to prosecutorial misconduct. *See Wend*, 235 P.3d at 1096; *Strock*, 252 P.3d at 1152.

### C.    The Prosecutor Could Not Have Foreseen that His Question Would Elicit an Inadmissible Response

¶ 36    During direct examination, the prosecutor asked Thompson why he called 911 following the incident. Thompson responded, "Because . . . a felony event had just occurred." Defense counsel objected to Thompson's answer as an improper legal conclusion, and the district court sustained the objection. Even so, Russell argues that the prosecutor committed misconduct by asking Thompson a question the prosecutor knew would elicit an inadmissible response. We disagree.

¶ 37    Nothing about how the prosecutor phrased the question suggested Thompson should respond by opining that Russell had

committed a felony. There are several other relevant and admissible reasons that Thompson could have given for why he called 911. In other words, the question did not elicit a prohibited response. That Thompson offered an improper opinion does not mean that the prosecutor committed misconduct. *See Wend*, 235 P.3d at 1096.

### D. The Prosecutor's Questions About Russell's Easement Do Not Amount to Prosecutorial Misconduct

¶ 38    Russell contends that the prosecutor committed misconduct by repeatedly asking potential jurors and witnesses questions about easements that were misleading and confused the issues. She notes that four out of the nine exhibits the prosecutor admitted at trial related to the access easement,[4] the prosecutor had Keyes read the easement descriptions out loud, and the prosecutor asked Keyes and Thompson numerous questions about the easement's scope. She argues that questions about the easement were so pervasive that "the jurors were likely to believe that whether anyone went past the easement boundaries was a determining factor in

---

[4] People's Exhibits 5-8 provided the jury with information about Keyes' and Russell's properties and the easement that provided ingress and egress to Keyes' property. When the prosecution introduced the exhibits, defense counsel objected only to Exhibit 8, a certified property record, on the basis that it was irrelevant.

whether [Russell's] conduct was reasonable." We discern no misconduct.

¶ 39    Evidence relating to the access easement across Russell's property was relevant because she asserted the use of physical force in defense of premises as an affirmative defense. *See* § 18-1-705. Whether Russell was "in possession or control of any . . . realty" and whether she reasonably believed Keyes was committing or attempting to commit "unlawful trespass" were squarely at issue based on that affirmative defense. *Id.* Consequently, the prosecutor was free to ask questions and make arguments about the easement and to respond to the theory of defense. *See Strock,* 252 P.3d at 1153 ("A prosecutor has wide latitude to make arguments based on facts in evidence and reasonable inferences drawn from those facts.").

¶ 40    On appeal, Russell does not contend that the evidence was inadmissible, only that the amount of time the prosecutor spent discussing it had the effect of misleading and confusing the jury. But based on our review of the record, we disagree with Russell's characterization of this evidence as having "pervaded the trial from voir dire through closing argument." Although the easement was a

20

feature of the prosecution's evidence, it did not dominate the narrative so as to mislead or confuse the jury. And no one suggested to the jury that the reasonableness of Russell's conduct hinged on the precise contours of the easement. Thus, we conclude the prosecutor did not commit misconduct by admitting evidence and asking questions about the easement. *See Wend,* 235 P.3d at 1096.

### IV. Reasonable Doubt Instruction

¶ 41    Russell contends that the district court erred by using a reasonable doubt instruction that unconstitutionally lowered and shifted the burden of proof. We disagree.

### A. Additional Background

¶ 42    Over Russell's objection, the district court gave the jury a reasonable doubt instruction that tracks the 2022 model criminal instruction:

> Every person charged with a crime is presumed innocent. This presumption of innocence remains with the defendant throughout the trial and should be given effect by you unless, after considering all the evidence, you are convinced that the defendant is guilty beyond a reasonable doubt.

21

The burden of proof in this case is upon the prosecution. The prosecution must prove to the satisfaction of the jury beyond a reasonable doubt the existence of each and every element necessary to constitute the crime charged. This burden requires more than proof that something is highly probable, but it does not require proof with absolute certainty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. If you are firmly convinced of the defendant's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt. But if you think there is a real possibility that the defendant is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt.

After considering all the evidence, if you decide the prosecution has proven each of the elements of a crime charged beyond a reasonable doubt, you should find the defendant guilty of that crime.

After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements of a crime charged beyond a reasonable doubt, you should find the defendant not guilty of that crime.

COLJI-Crim. E:03 (2022).

### B. Applicable Law and Standard of Review

¶ 43   The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond

22

a reasonable doubt of every fact necessary to constitute the crime with which [s]he is charged." *Tibbels v. People*, 2022 CO 1, ¶ 23 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Accordingly, trial courts "must properly instruct the jury on . . . the reasonable doubt standard." *Id.* at ¶ 25. Instructions that lower the prosecution's burden of proof constitute structural error and require automatic reversal. *Id.* at ¶ 22. To determine whether a court's instruction lowered the burden of proof, we "must ask whether there is a reasonable likelihood that the jury understood the court's statements, in the context of the instructions as a whole and the trial record, to allow a conviction based on a standard lower than beyond a reasonable doubt." *Id.* at ¶ 43.

¶ 44　　We review de novo whether a trial court's instructions improperly lowered the prosecution's burden of proof. *Id.* at ¶ 22; *Johnson v. People*, 2019 CO 17, ¶ 8.

### C.　The District Court's Instruction on Reasonable Doubt Did Not Lower or Shift the Prosecution's Burden of Proof

¶ 45　　Russell challenges three aspects of the district court's reasonable doubt instruction, contending that it (1) failed to inform the jury that it can consider the "lack of evidence" when making its

23

decision; (2) instructed the jurors that the prosecution does not meet its burden if they think there is "a real possibility that the defendant is not guilty"; and (3) failed to instruct the jury that a reasonable doubt is a doubt that would cause a reasonable person to "hesitate to act." As Russell concedes in her reply brief, however, at least two divisions of this court have now rejected these contentions. *See People v. Melara*, 2025 COA 48, ¶¶ 10-32; *People v. Schlehuber*, 2025 COA 50, ¶¶ 7-34. For the reasons articulated by those divisions, with which we agree, we reject Russell's contention that the district court's reasonable doubt instruction impermissibly lowered and shifted the burden of proof. *See Melara*, ¶ 32; *Schlehuber*, ¶ 7.

## V. Cumulative Error

¶ 46 Russell contends that, even if the alleged errors individually do not warrant reversal, their cumulative prejudice does. When reviewing for cumulative error, we ask whether "numerous formal irregularities, each of which in itself might be deemed harmless, may in the aggregate show the absence of a fair trial." *Howard-Walker v. People*, 2019 CO 69, ¶ 24 (quoting *Oaks v. People*, 371 P.2d 443, 446 (Colo. 1962)). For the doctrine to apply,

24

numerous errors must have been committed, not merely alleged. *People v. Shanks*, 2019 COA 160, ¶ 76.

¶ 47    Although we have assumed for purposes of efficiently resolving this appeal that the district court erred by admitting certain statements contained in Exhibit 4, for the same reasons we have concluded that the assumed errors were not plain, we also conclude that they "did not substantially prejudice the defendant's right to a fair trial." *People v. Whitman*, 205 P.3d 371, 387 (Colo. App. 2007); *see Hagos*, ¶ 14 (Plain error so undermine[s] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.).

## VI.  Deposition

¶ 48    We affirm the judgment of conviction.

JUDGE FOX and JUDGE MEIRINK concur.